A. Wesley **BARTHELMES**, Jr., et al.

v.

Willard A. **MORRIS**, individually, and as Administrator of the State Administrative Board of Election Laws, et al.

Civ. No. 72-275-B.

United States District Court, D. Maryland.

April 6, 1972.

Appeal Dismissed June 29, 1972.

Edward L. Genn, of Silver Spring, Md., for plaintiffs.

Henry R. Lord, Deputy Atty. Gen., and E. Stephen Derby, Asst. Atty. Gen., Baltimore, Md., for defendants.

BLAIR, District Judge.

I

This voting rights case asks for the convening of a three-judge court and invites a further invasion of what was once thought of as the "political thicket." For reasons appearing later in this opinion, the invitation is respectfully declined by the single judge to whom the application was made.

Plaintiff Chester is a registered Democratic voter of the Seventh Congressional District. Plaintiffs Adams and Barthelmes are registered Democratic voters of the Eighth Congressional District. Additionally, Barthelmes is a duly filed candidate for delegate from the Eighth Congressional District to the forthcoming Democratic National Convention. Plaintiffs seek for themselves and for all persons similarly situated declaratory and injunctive relief to avoid what they allege will be the debasement of their vote in the Maryland Election to be held May 16, 1972. In that election, Maryland will conduct a presidential preferential primary and select delegates to the Democratic National Convention. Defendants are the State Administrative Board of Election Laws and Willard A. Morris, its Administrator.[1]

Plaintiffs contend that Article 33, Annotated Code of Maryland, § 12–1(a)(1), apportioning an equal number of convention delegates to each of Maryland's eight congressional districts, deprives them of equal protection of the law in violation of the Fourteenth

---

1. At the hearing on the motion to dismiss, plaintiffs dismissed as defendants in this action the Maryland Secretary of State and Attorney General.

Amendment to the United States Constitution and deprives them of certain civil rights in violation of 42 U.S.C.A. § 1983. Jurisdiction is invoked under 28 U.S.C. A. § 1343(3) and (4). They seek the convening of a three-judge court pursuant to 28 U.S.C.A. §§ 2281 and 2284 and a declaration that the Maryland law is unconstitutional pursuant to 28 U.S. C.A. § 2201 and Rule 57, F.R.Civ.P. Plaintiffs ask that the defendants be enjoined from conducting the forthcoming Maryland election under the existing law or alternatively from certifying candidates as elected unless said election is conducted pursuant to a formula which will grant equal effective voting power to political party members throughout the state or in accordance with the so-called 50–50 apportionment formula of the Democratic National Committee.

This action was brought on March 17, 1972 and, on March 29, defendants moved to dismiss for failure to state a claim upon which relief could be granted. Defendants also oppose the convening of a three-judge court. In support of the motion, defendants claim that plaintiffs have failed to raise a substantial constitutional question, are barred by laches, and are not entitled to injunctive relief. On March 31, a hearing was held on defendants' motion and objection at which testimony was taken from defendant Morris.

## II.

Those portions of the Maryland election laws pertinent to this case and now codified as Article 33, Annotated Code of Maryland, §§ 12–1 and 12–2, were signed into law by the Governor on May 14, 1969, and became effective July 1, 1969. Portions of these laws including sections 12–1(b) and (c) and 12–2(a) were amended in 1971, effective July 1, 1971. On November 16, 1971, the deadline for changes of party affiliation passed, § 3–8(b), and within fifteen days thereafter, December 1, 1971, the local boards of election were required to submit the total registration for each party to the State Administra-

tive Board of Election Laws, § 3–9A(a). On December 6, 1971, the State Board issued an official statement of the total registered voters in the State affiliated with each party. § 3–9A(b). The new congressional district lines necessary to compute the figures shown in plaintiffs' Exhibit B were available in final form by May 6, 1971 when Chapter 353 of the Laws of Maryland of 1971 defining Maryland's congressional districts was signed into law, effective July 1, 1971.

Section 12–1(a) (1) states: "Of the number of delegates allotted to Maryland . . . there shall be elected from each congressional district an equal number of district delegates from the list of candidates certified to the boards by the State Administrative Board of Election Laws." With 53 Democratic delegates allotted to Maryland, § 12–1(a) (1) allocates six delegates to each of the eight Maryland congressional districts with five delegates to be selected at large by the elected delegate body. § 12–1(a) (2). On February 19, 1971, however, the Democratic Party guidelines for the allocation of delegates was adopted by the Democratic National Committee, requiring that apportionment of convention delegates within each state be based on a so-called 50–50 formula, giving equal weight to total population and to the Democratic vote in the previous presidential election. This formula would alter the delegate total to be selected in five congressional districts. The First, Fourth, and Sixth would lose one delegate each. The Seventh would gain two, and the Eighth, one. (Defendants' Exhibit 2).

At hearing, plaintiffs submitted a letter dated March 16, 1972 from Robert Nelson, Staff Director of the Democratic National Committee, stating that Maryland was one of two states which had not complied with this guideline. (Exhibit 1(f)).

The deadline for filing as a candidate for delegate to the National Convention was March 6, 1972. As of the date of the hearing, 550 candidates for delegate

to the Democratic National Convention had filed. The congressional district breakdown is as follows (Testimony of Willard A. Morris, Administrator, State Administrative Board of Election Laws, at hearing):

| | | |
|---|---|---|
| 1st | – | 28 |
| 2nd | – | 95 |
| 3rd | – | 93 |
| 4th | – | 79 |
| 5th | – | 74 |
| 6th | – | 46 |
| 7th | – | 59 |
| 8th | – | 76 |

Of this total, 121 delegates had formed alliances with various Democratic presidential contenders (Defendants' Exhibit 1):

| | | |
|---|---|---|
| Chisholm | – | 7 |
| Humphrey | – | 42 |
| Lindsay | – | 17 |
| McGovern | – | 36 |
| Muskie | – | 6 |
| Wallace | – | 13 |

However, only candidates McGovern and Humphrey in the Fourth and Sixth Congressional Districts had fielded full delegate slates. (Plaintiffs' Exhibit 3(h)).

The deadline for presidential candidates to file written permission for a delegate to have the candidate's name placed adjacent to his name on the ballot passed on March 23, 1972. § 12–1(a)(1). April 3 was the deadline for the withdrawal of all candidates. § 9–1(a). As of that date, the candidates and their alliances were locked in on the ballot. Ballot arrangements cannot be completed until all withdrawal and filing deadlines have passed and all candidates have been certified by the local boards as meeting the voter registration requirements. § 4A–1(a). All ballots must be final and posted by April 20, 1972. During the five-day period after posting, challenges can be made to the arrangement and form of the ballot only. § 16–4(b), testimony of Willard A. Morris.

On February 28, 1972, Senate Emergency Bill No. 350 (Plaintiffs' Exhibit C), was defeated. S.B. No. 350 would have replaced § 12–1(a) with the following subsection:

"(1) In the event that the national governing body of a party sets standards governing the apportionment of delegates to be elected from Congressional Districts to that party's convention, with which all state delegations must comply in order to be seated in the convention, then the Maryland delegates to that convention shall be apportioned in accordance with those rules and with the provisions of this paragraph. . . ."

March 6, 1972 was the last day for the introduction of bills in the current session of the Maryland General Assembly without suspension of Rules. Other than S.B. No. 350 which failed of passage, no bill amending § 12–1(a) has been introduced. The current session of the Assembly will end on April 10, 1972 and unless called into special session the Assembly will not reconvene until January 1973. This action was filed on March 17, 1972.

### III.

The standing of plaintiffs to bring this suit as a class action pursuant to Rule 23, F.R.Civ.P. need not now be determined.[2] Furthermore, plaintiffs conceded at the hearing that the requested declaratory and injunctive relief, if granted, would effectively provide for the class the same relief.

Plaintiffs clearly have standing to sue, a fact conceded by defendants. The test, as announced by the Court in Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962) is:

"Have the appellants alleged such a personal stake in the outcome of the controversy as to assure that concrete

---

2. The court was informed at the hearing that at the current session of the Maryland General Assembly, legislation was enacted and signed into law by the Governor removing from the law here challenged the process for selection of delegates to the Republican National Convention.

adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions?"

The *Baker* plaintiffs, qualified voters residing in various Tennessee counties who challenged that state's legislative apportionment, were held to have standing to maintain the suit. At 206, 82 S. Ct. 691. Subsequent cases have construed *Baker* as establishing the standing of voters to seek the protection of the United States Constitution against the dilution or debasement of their right to vote. Gray v. Sanders, 372 U.S. 368, 375, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963); Scott v. Hill, 449 F.2d 634 (6th Cir. 1971) and cases cited therein.

That action by the state is involved is clear where, as here, Maryland authorizes the conduct of a primary election through a legislative act and determines the formula for delegate selection. "State regulation of this preliminary phase of the election process makes it state action." Gray v. Sanders, *supra,* 372 U.S. at 374–375, 83 S.Ct. at 805. Defendants have likewise conceded this point.

### IV.

■ The role of the single judge to whom a three-judge court application is made is to first determine whether a substantial constitutional question is raised by the suit. If he concludes that it is, the resolution of that question is for a three-judge court unless the plaintiffs are otherwise clearly not entitled to relief.

An issue presented by the case must be justiciable. As the Court stated in *Baker*:

"Appellants' claim that they are being denied equal protection is justiciable, and if 'discrimination is sufficiently shown, the right to relief under the equal protection clause is not dimin-

ished by the fact that the discrimination relates to political rights.' Snowden v. Hughes, 321 U.S. 1, 11, [64 S. Ct. 397, 88 L.Ed. 497]."

369 U.S. at 210, 82 S.Ct. at 706. Facially, this suit presents such an issue for which a three-judge court may feel competent to fashion a remedy.

The thrust of plaintiffs' challenge to the constitutionality of the Maryland law is that the law denies to plaintiffs equal effective voting power and equal representation in the selection of their party's presidential candidate because "[t]he Maryland statutory method for allocating delegates to the Democratic National Convention is based on general population alone, without regard to party strength. . . ." As an example of the alleged unequal distribution of delegates about which plaintiffs complain, the Third Congressional District with 199,000 registered Democrats and the Fifth Congressional District with 107,-000 registered Democrats are each accorded the same strength—six delegates—to the Democratic National Convention.[3]

■ While it may be assumed *arguendo* that there can be valid and constitutionally acceptable reasons for departures from a strict adherence to the "one man-one vote" principle in political party nominating procedures, it has been recognized that such departures must result from a compelling state interest executed within a constitutionally rational design. The lack of a rational basis in a state's drawing or refusing to draw distinctions between various groups of citizens "leads to judicial imputation of the one man, one vote requirement." State of Georgia v. National Democratic Party, 447 F.2d 1271, 1277 (D.C.Cir.), cert. den. 404 U.S. 858, 92 S.Ct. 109, 30 L.Ed.2d 101 (1971).

In State of Georgia, the District of Columbia Circuit Court rejected a challenge to the delegate allocation formulas used on a national basis by both major

---

3. From figures compiled by the Maryland Administrator of Election Laws as of November 1971 and rounded to the nearest 1,000.

political parties. The contention in that case was that both national conventions must be reapportioned so that each delegate will represent a segment of the national population as nearly equal as is mathematically possible. The flaw in the contention advanced in that case as the court saw it was that plaintiffs were seeking to base delegate distribution on total population whereas "a delegate to a National Convention is to participate in a process leading to the designation of a candidate for national office—a prerogative he exercises on behalf of only a portion of the total local population." At 1279. The court went on to conclude "[w]e hold only that, in addition to our conclusions as to state action and justiciability, population alone cannot be the touchstone of the one man, one vote rule as that rule is sought to be applied in the case before us." At 1280.

In Bode v. National Democratic Party, 452 F.2d 1302 (D.C.Cir. 1971), cert. den. 404 U.S. 1019, 92 S.Ct. 684, 30 L.Ed.2d 668 (1972), the District of Columbia Circuit Court was called upon to review the holding of the lower court that the appropriate constitutional method of apportionment of delegates to the party's national convention was by a formula based upon the number of party voters voting in one or more immediately preceding presidential elections. In rejecting this holding, the court approved a plan similar to the so-called 50-50 reform plan which plaintiffs in the instant case urge upon the court as a constitutional plan for the conduct of the Maryland Primary Election. In approving the plan, the court found that it would not bring about a dilution or debasement violative of the Equal Protection Clause nor would it invidiously discriminate against a qualified voter.

Maxey v. Washington State Democratic Committee, 319 F.Supp. 673 (W.D. Wash.1970), appeal docketed, No. 71–1051 (9th Cir. Jan. 12, 1971), called into question the method utilized by the Democratic Party in the State of Washington for selection of delegates to the state and national conventions. In finding that the method used violated plaintiffs' rights under the Equal Protection Clause of the Fourteenth Amendment, the court said:

"On the merits of this case, I hold that the one-man-one-vote principle does apply to the manner of sending delegates to the state and national conventions. Plaintiffs' rights to vote and to have their votes weighted equally with all other votes have been unconstitutionally denied and diluted under the system presently employed by the defendant state committee." At 678.

A similar holding applying the one man-one vote principle to party delegate selection procedures was reached in Doty v. Montana State Democratic Central Committee, 333 F.Supp. 49 (D.Mont. 1971).

Although the aforementioned cases differ in the applicable standards which must govern delegate selection processes, central to each is the recognition that the Equal Protection Clause and the statutory civil rights guarantees apply in this sector of the "political thicket."

In viewing the constitutional question to determine whether it is one of substance, this court finds instructive language contained in Kramer v. Union Free School District No. 15, 395 U.S. 621, 626, 89 S.Ct. 1886, 1889, 23 L.Ed.2d 583 (1969):

" 'In determining whether or not a state law violates the Equal Protection Clause, we must consider the facts and circumstances behind the law, the interests which the State claims to be protecting, and the interests of those who are disadvantaged by the classification.' Williams v. Rhodes, 393 U.S. 23, 30 [89 S.Ct. 5, 21 L.Ed.2d 24], (1968). And, in this case, we must give the statute a close and exacting examination. '[S]ince the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully

and meticulously scrutinized.' Reynolds v. Sims, 377 U.S. 533, 562 [84 S.Ct. 1362, 12 L.Ed.2d 506] (1964). See Williams v. Rhodes, *supra*, [393 U.S.] at 31, [89 S.Ct. at 10]; Wesberry v. Sanders, 376 U.S. 1, 17, [84 S.Ct. 526, 11 L.Ed.2d 481] (1964). This careful examination is necessary because statutes distributing the franchise constitute the foundation of our representative society. Any unjustified discrimination in determining who may participate in political affairs or in the selection of public officials undermines the legitimacy of representative government."

In the case before this court, plaintiffs contend that Maryland's equal distribution of delegates by congressional districts is essentially a distribution based solely on general population and geography, thereby reflecting no measure of Democratic strength in the districts from which delegates are selected either by the number of party members registered to vote or the vote received by the Democratic presidential nominee in recent general elections.

To this court and in light of the authorities discussed above, these allegations are sufficient to raise a substantial question as to whether the Maryland law apportioning delegates to the Democratic National Convention meets constitutional requirements. Thus a three-judge court would have to be convened to resolve that constitutional question unless plaintiffs for other reasons are not entitled to the relief prayed.

### V.

Defendants urge upon the court that plaintiffs are barred by laches and the lateness of the hour. They say that plaintiffs elected to wait upon their claimed rights and that for the court to act now through equitable relief would be unduly disruptive and prejudicial to the electoral process in view of the proximity of the forthcoming May 16 election.

Whether a single judge is authorized to reach such a conclusion in a given case may not be entirely free of doubt. In that respect, it is but one more uncharted obstacle in the sea of uncertainty which surrounds three-judge courts. *See* Currie, The Three-Judge District Court in Constitutional Litigation, 32 U.Chi.L.Rev. 1 (1964).

A literal reading of Idlewild Bon Voyage Liquor Corp. v. Epstein, 370 U.S. 713, 82 S.Ct. 1294, 8 L.Ed.2d 794 (1962), is of no particular help:

> "When an application for a statutory three-judge court is addressed to a district court, the court's inquiry is appropriately limited to determining whether the constitutional question raised is substantial, whether the complaint at least formally alleges a basis for equitable relief, and whether the case presented otherwise comes within the requirements of the three-judge statute."

At 715, 82 S.Ct. at 1296.

It is not difficult to envision cases which, while presenting apparently substantive questions, are ones in which it is clear beyond doubt that equitable relief, although properly requested, would be inappropriate. In such cases, it would serve no end in law or reason to require that the cumbersome machinery of a three-judge court be cranked into existence merely to dismiss the case because the relief sought clearly ought not to be granted. More is required of a single judge than to act as a functionary. Pederson v. Breier, 327 F.Supp. 1382, 1385 fn. 3 (E.D.Wis.1971).

At least two of my brothers on this bench seem to have adopted this view. Judge Thomsen in Pohoryles v. Mandel, 312 F.Supp. 334 (D.Md.1970), found that no substantive constitutional question was presented in the case and that under the circumstances of a forthcoming election, injunctive relief would be inappropriate. Similarly, Judge Miller decided that injunctive relief was not available in a case involving the 1972 Maryland Election. Shapiro v. State of Maryland, 336 F.Supp. 1205 (D.Md. 1972). In Maryland Citizens for a Rep-

resentative General Assembly v. Governor of Maryland, 429 F.2d 606, 611 (4th Cir. 1970), Chief Judge Haynsworth, speaking for the court, indicated that the unavailability of injunctive relief goes to the substantiality of the claim and is within the province of the single district judge to determine. I, therefore, conclude that I have not only the right but the duty to determine whether injunctive relief is available to the plaintiffs in this case.

That the states have a vital interest in conducting an orderly election cannot be doubted. In Maryland, that interest is expressly reflected by laws establishing the machinery for elections and the qualifications and other requirements for candidates in the May 16 election.

No valid reason appears why plaintiffs waited until less than eight weeks before the election to bring this case. The law they now challenge was in its present form not later than July 1, 1971. Much of the data upon which they base their claim was available by that date and at the latest by December 1971. The fact that they first sought redress through legislative change was an election on their part which affords no valid excuse for the delay. They do not nor could they contend that this challenge could not have been mounted in the courts before it became apparent that relief would not be forthcoming through the legislative process. Principles of federalism and a decent respect for other branches of government augur strongly that a state be afforded an opportunity to adopt a constitutional plan when a court strikes down an existing plan. As previously noted, the current session of the Maryland General Assembly will adjourn *sine die* on April 10, 1972. The court will judicially note that the adoption of a new delegate apportionment plan for the forthcoming election by the State of Maryland is now foreclosed by time alone.

Plaintiffs contend that relief may be granted without unduly disrupting the electoral process. They point out that their cause is dissimilar to the usual redistricting or reapportionment cases and they say that since certain dates of finality have not been reached, a court could fashion relief by decreeing minor adjustments in the delegate apportionment plan. While this view may seem theoretically supportable, it is to this court overly simplistic. The court finds far more support for defendants' argument that the election process which will culminate on May 16, is an evolving one starting months, if not years, ago. The deadline for filing of candidates was March 6, almost two weeks before this case was commenced. The deadline for withdrawal of candidates has already passed on April 3. Five hundred fifty candidates have filed for delegate to the Democratic National Convention. Alliances have been formed, as represented by the designation of various delegates by presidential contenders.

It is true as plaintiffs say that the election process is one fraught with uncertainty. It does not follow, however, that a court should add a further element of wholly unanticipated uncertainty into the process at the eleventh hour.

The election machinery in Maryland is composed of a Board of Supervisors of Elections in each of twenty-three counties and the City of Baltimore and the State Administrative Board of Election Laws. If this machinery is to fulfill its assigned role on May 16, it must not be unduly burdened by change and uncertainty in the processes which lead up to that election. While this court is persuaded that there may be differences between the relief sought in the instant case and reapportionment and redistricting cases, all have in common the element of change. It is that change, at this late hour, quite apart from its magnitude, which this court believes to be entirely too disruptive of the election apparatus to be consistent with the objective of an orderly election.

Alternatively, plaintiffs say that disruption could be avoided by enjoining the entire election process insofar as it

pertains to the selection of delegates to the National Convention. In lieu thereof, they say the court could fashion a remedy for a constitutionally satisfactory selection plan. However, only compelling reasons could justify a court in entertaining such a view. There is clear authority for refusing to void an election even where it had already been determined that the apportionment plan under which the election was to be conducted was unconstitutional. *See* the discussion by Chief Judge Haynsworth in *Maryland Citizens, supra* at 610. In the instant case there is even less justification for this court to act, especially in view of the fact that the constitutionality of the Maryland Law has not been decided.

As the Supreme Court has declared in Reynolds v. Sims, 377 U.S. 533, 585, 84 S.Ct. 1362, 1394, 12 L.Ed.2d 506 (1964) in dealing with legislative reapportionment:

"In awarding or withholding immediate relief, a court is entitled to and should consider the proximity of a forthcoming election and the mechanics and complexities of state election laws, and should act and rely upon general equitable principles. With respect to the timing of relief, a court can reasonably endeavor to avoid a disruption of the election process which might result from requiring precipitate changes that could make unreasonable or embarrassing demands on a State in adjusting to the requirements of the court's decree. As stated by Mr. Justice Douglas, concurring in Baker v. Carr, 'any relief accorded can be fashioned in the light of well-known principles of equity.' "

At 585, 84 S.Ct. at 1394.

■ This court is persuaded that plaintiffs' claim is barred by laches and that the lateness of the hour precludes the issuance of injunctive relief. Accord-

ingly, the action will be dismissed without the convening of a three-judge court. Counsel will present an appropriate order of dismissal in accordance with this opinion.[4]

---

4. Even though evidence was taken at the hearing, the court is satisfied on the basis of the pleadings, the facts agreed to by counsel, and a liberal exercise of judicial notice that the matter may be decided on the basis of the motion rather than as a motion for summary judgment pursuant to Rule 12(b), F.R.Civ.P.