Modjeska M. SIMKINS, F. B. Drakeford, Billie S. Flemming, Freddie Jolley, Isaac W. Williams, Dorothy Drakeford, Lenny Springs, Frank Gilbert, S. T. Peden, Hyland Davis, and Marva Smalls, Individually and on behalf of all others similarly situated, Plaintiffs,

v.

L. Marion GRESSETTE, Individually, in his official capacity as President Pro Tempore of the Senate of South Carolina, and as a representative of the class of members of the Senate of South Carolina, Richard W. Riley, Individually and in his capacity as Governor of South Carolina, Ferdinan Stevenson, Individually and in her capacity as President of the South Carolina Senate, Rex L. Carter, Individually and in his official capacity as Speaker of the South Carolina House of Representatives, and as a representative of the class of members of the South Carolina House of Representatives, H. Ray Ham, Margaret Townsend, Zilla Hinton, James O. Brown, and Neal D. Thigpen, Individually and in their capacities as members of the South Carolina State Election Commission, Daniel I. Ross, Jr., Chairman of the South Carolina Republican Party and Donald L. Fowler, Chairman of the South Carolina Democratic Party, individually and as representatives of the class of officers of duly certified political parties of South Carolina, Defendants.

Civ. A. No. 80–500–8.

United States District Court, D. South Carolina, Charleston Division.

May 21, 1980.

Mordecai C. Johnson, Florence, S. C., Fred Henderson Moore, Charleston, S. C., for plaintiffs.

Daniel R. McLeod, Atty. Gen., for State of South Carolina, Randall T. Bell, Columbia, S. C., for defendants.

## ORDER

BLATT, District Judge.

This is an action seeking reapportionment of the South Carolina Senate prior to the 1980 primary and general elections. The plaintiffs are eleven black citizens and registered electors of the State of South Carolina, residing in different counties across the State. The defendants are various state officials and the chairmen of the State Democratic and Republican parties. In their complaint, plaintiffs allege that the present Senate apportionment plan dilutes their voting strength in violation of the First, Thirteenth, Fourteenth, and Fif-

teenth Amendments to the United States Constitution, Section 2 of the Voting Rights Act of 1965, and 42 U.S.C., Sections 1971 and 1983. The plaintiffs have requested the convening of a three–judge district court pursuant to 28 U.S.C. Section 2284. In response, the defendants have filed motions to dismiss under Rule 12(b), Federal Rules of Civil Procedure, which motions they contend may be granted by a single judge.

In view of the decision of the Fourth Circuit Court of Appeals in *Maryland Citizens for a Representative General Assembly v. Governor of Maryland*, 429 F.2d 606 (4th Cir. 1970), this Court is of the opinion that it should not seek to have a court of three judges convened and that the motions to dismiss should be granted.

## I.

The present litigation has its genesis in the reapportionment of the South Carolina Senate after the 1970 decennial census. When the census figures were published in 1971, the General Assembly of South Carolina met in special session to reapportion electoral districts for the State Senate, the State House of Representatives, and the United States Congress. At that special session, Act No. 932 of 1971, containing alternate plans for the reapportionment of the Senate–(hereinafter, the 1971 Plans)–

was approved.[1] The 1971 Plans involved a combination of multimember and single member senatorial districts, with numbered seats, and with a residence requirement in the multimember districts.

Shortly after their enactment, the 1971 Plans were challenged in this Court in a suit styled *McCollum v. West*.[2] That suit was brought by several black plaintiffs on behalf of all black voters who resided in multimember districts.[3] The *McCollum* plaintiffs sought an injunction against the enforcement of the 1971 Plans on the ground, *inter alia*, that, given past voting discrimination against black citizens, the use of multimember districts in combination with numbered seats and a majority vote requirement in the party primaries[4] diluted their voting strength in violation of the First, Fourteenth and Fifteenth Amendments and 42 U.S.C. Section 1983.[5] They asked the Court to order legislative reapportionment of the Senate, using single–member election districts on a statewide basis;[6] in the alternative, they asked the Court to adopt and enforce its own reapportionment plan.[7]

On April 7, 1972, this Court struck down the 1971 Plans, finding that they violated the Fourteenth Amendment one man, one vote principle.[8] The Court, however, declined to draw its own reapportionment plan until the General Assembly had been

1. 57 S.C.Stat. at Large 2071 (1971).

2. *McCollum v. West*, Civil Action No. 71–1211 (D.S.C. filed 12/7/71). The *McCollum* case was heard and determined together with two companion cases: *Twiggs v. West*, Civil Action No. 71–1106 (D.S.C.1972), and *McLeod v. West*, Civil Action No. 71–1123 (D.S.C.1972). C. Kenneth Powell and other members of the South Carolina Republican Party intervened as plaintiffs in the *McLeod* suit. *Twiggs* and *McLeod* challenged the 1971 Plans for failure to conform to the one man, one vote principle of *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964); these suits did not raise the issue of dilution of black voting strength presented in *McCollum*.

3. *McCollum* Complaint, Para. 4.

4. Section 23–496, Code of Laws of South Carolina, 1962, provided in part: "No candidate shall be declared nominated in a first primary

election unless he received a majority of the votes cast for the office for which he was a candidate." This same provision is now codified as Section 7–17–600, Code of Laws of South Carolina, 1976. It applies to all state and local offices for which primary elections are held in South Carolina, not just Senate offices.

5. See *McCollum*, Complaint, Paras. 11, 13; Pl.'s Brief, pp. 9–10, 12.

6. *McCollum* Complaint, at p. 6, Para. (c).

7. *Id.*, Para. (d).

8. *McCollum*, Order of 4/7/71, at 20. The various orders of the court in *McCollum* and its companion cases are unreported. In this opinion, references will be by date of the Order and page number.

given an opportunity to enact a new plan.[9] The Court also refused to mandate state-wide single member districts or to abolish numbered seats as requested by the *McCollum* plaintiffs.[10] It expressly rejected plaintiffs' claims of racial voting dilution, noting that

. . . there is not the slightest evidence that in its reapportionments, South Carolina has ever been motivated by racial considerations. In fact, we understood that counsel for McCollum conceded the want of racial motivation in the reapportionment plans reviewed in this action.[11]

In response to the Court's Order of April 7, 1972, the General Assembly enacted Act No. 1205 of 1972, which again contained alternate plans–(Plan A and Plan B)–for reapportioning the Senate.[12] Upon approval by the Governor, Act 1205 was submitted to the Court for review. On May 23, 1972, the Court issued a second Order, stating:

The Court finds Plan A [of Act 1205] complies with the requirements of the Constitution of the United States, and it is therefore approved.

Accordingly, it is ordered that the impending elections to the South Carolina Senate and all subsequent elections be held in conformity with Plan A of the Act unless it is revised by the General Assembly or until after the census of 1980 or the further order of this Court.[13]

Thereafter, the *McCollum* plaintiffs filed a motion to vacate or modify the Court's May 23, 1972, Order, arguing that Plan A diluted black voting strength, just as the 1971 Plans had allegedly done, by the use of multimember districts in conjunction with numbered seats and the majority vote requirement.[14] On June 9, 1972, the Court entered a third Order, denying the motion to vacate or amend, and that Order concluded by stating:

Although the Court decided that Plan A complies with the guidelines of the Court's earlier order, the order of May 23 adopting Plan A expressly noted that elections should be held in conformity with Plan A until "further order of this Court". Any party seeking to challenge Plan A may, of course, bring an action seeking further relief. If such a party can prove Plan A constitutionally infirm based on facts not previously presented to this Court, relief would not be barred by the doctrine of *res judicata*.[15]

On July 11, 1972, the *McCollum* plaintiffs filed notice of appeal to the United States Supreme Court from the Court's decision approving Plan A. The appeal was never perfected.[16]

In accordance with this Court's Orders in *McCollum*, the 1972 and 1976 elections for the South Carolina Senate were conducted under Plan A.[17] Plan A divides the State into sixteen senatorial districts, of which

9. *Id.*, 16–17, 20.

10. *Id.*, 17, 19.

11. *Id.*, 18.

12. See 57 S.C.Stat. at Large 2384 (1972).

13. *McCollum*, Order of 5/12/72, at 2–3.

14. A separate motion to vacate the May 23, 1972, Order was also filed by C. Kenneth Powell, an intervenor in the companion case, *McLeod v. West.* Powell's motion was based on Fourteenth Amendment equal protection and due process grounds; it raised no issue of racial voting dilution.

15. *McCollum*, Order of 6/9/72, at 2.

16. The Supreme Court, on September 19, 1972, granted the *McCollum* plaintiffs an extension of time until November 21, 1972, within which

to docket the appeal. In the meantime, two of the *McCollum* plaintiffs commenced suit under Section 5 of the Voting Rights Act of 1965 in the United States District Court for the District of Columbia. See *Harper v. Kleindienst*, 362 F.Supp. 742 (D.D.C.1973), aff'd., 520 F.2d 53 (D.C.Cir. 1975). This suit eventually culminated in the decision of the United States Supreme Court in *Morris v. Gressette*, 432 U.S. 491, 97 S.Ct. 2411, 53 L.Ed.2d 506 (1977). A second appeal from this Court's May 23, 1972, Order approving Plan A was taken to the Supreme Court by C. Kenneth Powell. See n. 14, *supra*. The Supreme Court affirmed the decision of this Court. See *Powell v. West*, 413 U.S. 901, 93 S.Ct. 3049, 37 L.Ed.2d 1020 (1973).

17. Plan A is now codified as Section 2–1–60, Code of Laws of South Carolina, 1976.

three are single member districts, and the remainder are multimember districts containing from two to five senators in each district. Each Senate seat is separately numbered and candidates may qualify for only one such seat in any one election. The election ballots in each multimember senatorial district are required to indicate the number assigned to each Senate seat and the names of the candidates therefor. Because the 1980 decenniel census will not be published until 1981, there has been no reapportionment of the Senate since 1972, and the 1980 senatorial elections are scheduled to be conducted under Plan A.

## II.

Against this background, the present action was commenced by the filing of the Complaint and a Motion for Temporary Restraining Order on Friday, March 14, 1980, two days before the statutory period for primary election entries opened for senatorial offices.[18]

Because filing and campaigning for the June 10, 1980, primary elections were imminent and the relief requested by plaintiff was statewide in nature, this Court immediately set a hearing for March 19, 1980, on the Temporary Restraining Order motion. Notice of this hearing was given to all parties on the same day the Complaint was filed.

On March 19, 1980, after appropriate notice, counsel for the plaintiffs and all defendants appeared and were heard on the question of whether a temporary restraining order should be granted. In considering that motion, this court applied the same standard applicable to a motion for a preliminary injunction. See *Sampson v. Murray*, 415 U.S. 61, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974); 11 Wright & Miller, Federal

Practice and Procedure, § 2951; 7–Pt. 2 Moore's Federal Practice ¶ 65.05. After reviewing the pleadings and orders in the *McCollum* case, the Complaint in this action, affidavits submitted by the parties on the issue of irreparable harm, and the case law in this circuit, this court concluded, for the reasons then orally stated, that the balance of hardship favored the defendants, that the harm to the public interest would be unusually great if a restraining order were issued, and that the plaintiffs' likelihood of success on the merits was greatly diminished by the decision in *Maryland Citizens, supra*, and the prior finding of the *McCollum* court that Plan A was constitutional under the Fourteenth and Fifteenth Amendments. Moreover, this court was unable to make a "specific finding", as required by 28 U.S.C. Section 2284(b)(3), that irreparable harm would result to the plaintiffs' constitutional and statutory rights if the restraining order was not granted. Applying the test established in *Blackwelder Furniture Co. v. Seilig Mfg. Co.*, 550 F.2d 189 (4th Cir. 1977), and the cases following the *Blackwelder* doctrine,[19] the motion for a temporary restraining order was denied.

In order to proceed promptly with the case, an expedited schedule for filing all pleadings and motions was set at the March 19, 1980, hearing. The defendants were given until March 31, 1980, twelve days from the date of the hearing, to file and serve on plaintiffs all responsive pleadings and motions. At the request of their counsel, the plaintiffs were granted fourteen days, i. e., until April 14, 1980, to respond to any motions served by the defendants. Counsel were also advised that the Court would set another hearing date as soon as possible, after all pleadings and motions had been filed with the Court.[20] The defend-

---

**18.** See Section 7–13–40, Code of Laws of South Carolina, 1976, as amended, which provides in pertinent part:

> . . . the entries for those wishing to offer for nomination in [a] party primary for State Senator . . . shall open at noon on March sixteenth and close at noon on March thirtieth.

**19.** See, e. g., *Fort Sumter Tours, Inc. v. Andrus*, 564 F.2d 1119 (4th Cir. 1977); *Maryland Undercoating Co., Inc. v. Payne*, 603 F.2d 477 (4th Cir. 1979); *Telvest, Inc. v. Bradshaw*, 618 F.2d 1029 (4th Cir. 1980).

**20.** April 14, 1980, coincided with the date for the beginning of a complex criminal conspiracy trial, involving multiple defendants, to which this court had been previously assigned. Coun-

ants filed their Answer and Rule 12(b) Motion to Dismiss on March 31, 1980. The Plaintiffs thereafter filed responsive papers on April 14, 1980.

On April 18, 1980, the Attorney General of the United States filed suit against the State of South Carolina, alleging that Plan A was racially discriminatory, and seeking certain interim relief for the 1980 elections for the State Senate.[21] The complaint of the United States was accompanied by a Motion for Preliminary Injunction and a Request for a Three–Judge District Court.

After reviewing the pleadings and motions in the instant case, and the separate action instituted by the Attorney General, the Court, on April 22, 1980, gave notice to all parties that a hearing had been scheduled in both cases for May 1, 1980. The United States subsequently informed the Court that it was withdrawing its request for a preliminary injunction in light of the United States Supreme Court's decision in *City of Mobile v. Bolden*, —— U.S. ——, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980). On April 24, 1980, the Court signed a consent Order suspending all proceedings in the Government's separate suit until June 1, 1980. Informal notice was given to all parties that the May 1, 1980, hearing would proceed as scheduled in this case in order to achieve prompt resolution of the issues

raised by the motions of the parties. After oral argument by counsel for all parties at the hearing on May 1, 1980, the Court took the case under advisement.

## III.

■ The duty of the single judge to whom a request for a three–judge court is made is first to determine whether a substantial claim for relief is raised by the suit. This duty is implicit in the words, "unless he determines that three judges are not required," found in the statute itself. 28 U.S.C. Section 2284(b)(1). If the suit raises no substantial claim, the · single judge should properly dismiss the action on his own. *Ex parte Poresky*, 290 U.S. 30, 54 S.Ct. 3, 78 L.Ed. 152 (1933).

■ The test to be applied· in determining whether a suit raises a substantial claim ·for relief was explicitly stated by the Fourth Circuit Court of Appeals in *Maryland Citizens, supra*, at 611:

Insubstantiality in the claim may appear because of absence of federal jurisdiction, lack of substantive merit in the constitutional claim, or because injunctive relief is otherwise unavailable. [Footnotes omitted] [22]

A careful reading of that decision indicates that when, as here, suit is commenced a

sel were advised of this fact at the March 19, 1980, hearing.

**21.** *United States of America v. State of South Carolina*, Civil Action No. 80–730–8, Complaint filed April 18, 1980.

**22.** The test has been articulated in similar language in other cases. In *Idlewild Bon Voyage Liquor Corp. v. Epstein*, 370 U.S. 713, 715, 82 S.Ct. 1294, 1296, 8 L.Ed.2d 794 (1962), the Supreme Court described the standard as follows:

When an application for a statutory three–judge court is addressed to a district court, the court's inquiry is appropriately limited to determining whether the constitutional question raised is substantial, whether the complaint at least formally alleges a basis for equitable relief, and whether the case presented otherwise comes within the requirements of the three-judge statute.

In *Shapiro v. State of Maryland*, 336 F.Supp. 1205, 1207 (D.Md.1972), the court stated:

The claim of the plaintiff may be found to be insubstantial from a number of circumstances, such as the absence of federal jurisdiction, lack of standing of the plaintiff to sue, lack of substantive merit in the constitutional claim, or because injunctive relief is otherwise unavailable.

Cf. *Sharrow v. Peyser*, 443 F.Supp. 321 (S.D.N.Y.1977), aff'd, 582 F.2d 1271 (2nd Cir. 1978), and in *Farr v. O'Keefe*, 27 F.Supp. 216 (S.D. Miss.1939), the Court articulated the standard in these words:

The district judge to whom the petition is presented must first determine, before going to the trouble and expense of convening such a court, whether the relief sought could be granted. If the relief sought could be granted, it is the duty of the district court to convene the three-judge court, but if it is apparent that the complainant seeks relief to which he is not entitled, then there is an insuperable impediment to his remedy and the district judge need go no further.

very short time before the election process begins, "the federal courts should withhold relief *regardless of the plaintiffs' claim.*" *Id.,* at 610 (emphasis added). Likewise, in *Reynolds v. Sims,* 377 U.S. 533, 585, 84 S.Ct. 1362, 1394, 12 L.Ed.2d 506 (1964), the Supreme Court recognized that, even though an apportionment plan was found to be invalid, a federal court might be justified in denying relief:

> \* \* \* [U]nder certain circumstances, *such as where an impending election is imminent and a State's election machinery is already in progress,* equitable considerations might justify a court in withholding the granting of immediately effective relief in a legislative apportionment case, *even though the existing apportionment scheme was found invalid.* In awarding or withholding immediate relief, *a court is entitled to and should consider the proximity of a forthcoming election and the mechanics and complexities of state election laws, and should act and rely upon general equitable principles.* With respect to the timing of relief, a court can reasonably endeavor to avoid a disruption of the election process which might result from requiring precipitate changes that could make unreasonable or embarrassing demands on a State in adjusting to the requirements of the court's decree. [Emphasis added.]

This case presents a classic instance for the application of these cited principles. The present plan of apportionment for the South Carolina Senate has been in effect since 1972, stamped with the approval of this Court. Plaintiffs were unquestionably aware that the 1980 elections for the State Senate would be held under this plan; yet plaintiffs waited until literally the last possible day before the Senate filing period was to open to institute this suit. Counsel for the plaintiffs have offered no reasonable explanation for this untoward delay in commencing this suit.

In these circumstances, it would be impossible to order reapportionment of the South Carolina Senate without imposing immediate disruption on political candidates, the voters, and the election process. Whether development of a new reapportionment plan was left to the General Assembly, as it should be in the first instance [23] when the State has not been recalcitrant in its reapportionment obligations, or whether such reapportionment was undertaken by a Three-Judge Court, the task could not possibly be completed prior to the June 10, 1980, primary elections. If the Court were to postpone Senate filings and elections, two sets of elections would then be required; double costs and double burdens would be imposed on the political parties. The filing period for Senate seats would have to be reopened and those candidates who have already filed for seats and begun campaigning under the present plan may find themselves suddenly placed in new districts. They would lose the benefit of the campaigning they have already undertaken and they would have to begin the campaign process again in a new district. It would not be enough, as plaintiffs have suggested, simply to refund their filing fees; money already spent on the campaign would be lost. Such critical political intangibles as recognition among, and identification with, constituents would be irreversibly affected. The candidates' campaign organizations and political alliances would be disrupted. It is also reasonable to assume that considerable voter confusion would result when citizens found themselves no longer in the same senatorial district, and likely faced with choosing from unfamiliar candidates for Senate seats.

It requires no special insight to perceive the immediate disruption of the 1980 election process which would follow if the relief requested by the plaintiffs were granted. In fact, the potential for disruption is even greater here than it was in the *Maryland Citizens* case, *supra,* because the election process was much further advanced when this suit was commenced. At the time the *Maryland Citizens* case was heard by the single judge, over ten weeks remained before the close of the candidate filing period,

---

**23.** *Wise v. Lipscomb,* 437 U.S. 535, 98 S.Ct. 2493, 57 L.Ed.2d 411 (1978).

and some twenty weeks remained until the primary elections. In this case the candidate filing period had closed two weeks before the plaintiffs were in position to file their memoranda and other papers with the Court on April 14, 1980, and the primary election was only eight weeks away.

When the potentially severe disruption of the impending election process is weighed against the unreasonable delay of plaintiffs in commencing a suit which should have been instituted much earlier, traditional equitable principles dictate, in this Court's opinion, that relief must be denied. Such a conclusion has been reached by other courts in this circuit under similar circumstances. See *Barthelmes v. Morris*, 342 F.Supp. 153 (D.Md.1972), appeal dismissed June 29, 1972 (4th Cir. 1972); *Shapiro v. State of Maryland*, 336 F.Supp. 1205 (D.Md.1972); *Dobson v. Mayor and City Council of Baltimore*, 330 F.Supp. 1290 (D.Md.1971); cf., *Maddox v. Wrightson*, 421 F.Supp. 1249, 1252 (D.Del. 1976).

■ Another factor which weighs heavily against the plaintiffs in this case is the nearness of Senate redistricting on the basis of the 1980 decenniel census. In *Reynolds v. Sims, supra*, at 583, 84 S.Ct. at 1393, the Supreme Court stated:

> Limitations on the frequency of reapportionment are justified by the need for stability and continuity in the organization of the legislative system . . . . In substance, we do not regard the Equal Protection Clause as requiring daily, monthly, annual or biennial reapportionment, so long as a State has a reasonably conceived plan for periodic readjustment of legislative representation.

The 1980 census is presently in progress, but the published data will not be available until 1981. If a Three-Judge Court were to order reapportionment of the Senate in 1980, such plan would, of necessity, have its basis on the 1970 census figures, which are now ten years out of date. There is little likelihood that such a plan would provide fair representation for the people of South Carolina in accordance with the "one man, one vote" mandate of *Reynolds*. Further-

more, when the results of the 1980 census are published next year, the state legislature would surely be required to reapportion the Senate again on the basis of the new census figures; thus, the disruption caused by reapportionment with undue frequency would be added to the disruption caused by halting the 1980 elections once they have begun. Principles of equitable relief clearly militate against such a result.

The Court is not faced with a recalcitrant legislature which has refused to reapportion itself in the face of clear constitutional or judicial mandate. South Carolina promptly reapportioned the Senate after the 1970 census. The present reapportionment plan was promptly enacted in response to the judicial mandate of the Three-Judge Court. Such plan comes to this Court with a heavy presumption of validity, having been expressly approved by the Court as a plan that "complies with the requirements of the Constitution of the United States." Under these circumstances, it is the feeling of this Court that the relief requested by plaintiffs is unavailable at this late date.

■ Because this Court is of the opinion that it is clear beyond doubt that equitable relief should be denied in this case, it would serve no purpose to convene a three–judge court merely to dismiss the action. *Maryland Citizens, supra*, at 611; *Barthelmes v. Morris, supra*, at 159; cf., *Rodos v. Michaelson*, 396 F.Supp. 768 (D.R.I.1975), reversed on other grounds, 527 F.2d 582 (1st Cir. 1975) (unnecessary referrals to three–judge court disapproved); *Relco, Inc. v. Consumer Product Safety Commission*, 391 F.Supp. 841 (S.D.Tex.1975) (three–judge court procedure is an extraordinary one which should not be unnecessarily invoked).

At oral argument, counsel for the plaintiffs earnestly argued that *Maryland Citizens* should not be applied to deny relief in this case, because a claim of racial discrimination is present here. It was also argued that *Maryland Citizens* should not now be considered as good authority in light of the later Supreme Court decision in *Goosby v. Osser*, 409 U.S. 512, 93 S.Ct. 854, 35 L.Ed.2d 36 (1973). These issues will be hereinafter reviewed.

First, it is well to note that *Maryland Citizens* was concerned only with the inappropriateness of equitable relief, not with the insubstantiality of a claim on its merits. *Goosby*, on the other hand, was addressed to the insubstantiality of a claim on its merits, and, therefore, in this Court's opinion, *Goosby* does not affect the continued validity of *Maryland Citizens*. Second, while plaintiffs are correct that the *Maryland Citizens* case involved no claim that the voting strength of a racial minority was being unlawfully diluted, plaintiffs have cited no authority suggesting that general principles governing equitable relief do not apply in cases of alleged racial discrimination. See *Williams v. Rhodes*, 393 U.S. 23, at 63–69, 89 S.Ct. 5, at 27–30, 21 L.Ed.2d 24 (Warren, C. J., dissenting). Significantly, *Whitcomb v. Chavis*, 396 U.S. 1055, 90 S.Ct. 748, 24 L.Ed.2d 757 (1970), the case forming the principal basis for the decision in *Maryland Citizens*, did involve a claim of racial voting dilution; likewise, *Maryland Citizens* itself has been applied in cases where the claim of racial discrimination was at the heart of the claim. See, e. g., *Shapiro v. State of Maryland, supra* (racial gerrymandering); *Dobson v. Mayor and City Council of Baltimore, supra* (racial gerrymandering). In the related area of law under Section 5 of the Voting Rights Act of 1965, where racial discrimination in voting was the central issue, the courts have uniformly followed general equitable principles in denying immediate injunctive relief.[24] While the right of each citizen to a fair and effective vote is precious, these cases suggest that general

principles of equity are not automatically suspended because the talisman of racial discrimination is invoked.[25]

The suggestion that *Maryland Citizens* is no longer valid in light of *Goosby v. Osser* is likewise unsupported by the cases. The Fourth Circuit Court of Appeals, sitting en banc, has cited the *Maryland Citizens* case with approval after *Goosby* was decided. (*Age of Minority Educational Corp. v. Preller*, 512 F.2d 1241, 1245 (4th Cir. 1975)). *Maryland Citizens* has also been considered good authority by other Courts in decisions rendered after *Goosby*.[26] Moreover, it seems apparent that *Goosby* merely affirmed the teaching of earlier cases, such as *Ex parte Poresky*, 290 U.S. 30, 54 S.Ct. 3, 78 L.Ed. 152 (1933) and *Hannis Distilling Co. v. Baltimore*, 216 U.S. 285, 30 S.Ct. 326, 54 L.Ed. 482 (1910).[27] The principles set forth in *Goosby*, in this Court's opinion, offer no new law.

■ On the basis of the foregoing considerations, this Court is convinced that the instant action is one in which injunctive relief is clearly unavailable to the plaintiffs. General equitable considerations, including plaintiffs' inexcusable delay in commencing the action and the potentially severe disruption of the 1980 senatorial elections, demand, this Court feels, that this action be dismissed by a single judge and that the request for the convening of a Three–Judge Court be denied.

## IV.

■ Since this Court has concluded that general equitable principles would preclude

---

24. See, e. g. *Allen v. State Board of Elections*, 393 U.S. 544, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969); *Georgia v. United States*, 406 U.S. 901, 92 S.Ct. 1601, 31 L.Ed.2d 812 (1972); *Berry v. Doles*, 438 U.S. 190, 98 S.Ct. 2692, 57 L.Ed.2d 693 (1978); *Wilson v. North Carolina State Board of Elections*, 317 F.Supp. 1299 (M.D.N.C.1970).

25. Compare the following statement of Mr. Justice Stevens, concurring in *City of Mobile v. Bolden*, —— U.S. ——, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980):

Whatever the proper standard for identifying an unconstitutional gerrymander may be, I have long been persuaded that it must apply equally to all forms of political gerrymandering–not just to racial gerrymandering.

26. *Doe v. Temple*, 409 F.Supp. 899, 901 (E.D. Va.1976); *Citizens Committee to Oppose Annexation v. City of Lynchburg*, 400 F.Supp. 68, 71, n. 1. (W.D.Va), aff'd in part and vacated in part on other grounds, 528 F.2d 816 (4th Cir. 1975); *Louisiana Affiliate of NORML v. Guste*, 380 F.Supp. 404, 406 (E.D.La.1974), aff'd, 511 F.2d 1400 (5th Cir.) (Table), cert. denied, 423 U.S. 867, 96 S.Ct. 129, 46 L.Ed.2d 96 (1975); *Horn v. O'Cheskey*, 378 F.Supp. 1280, 1283 (D.N.M.1974); *McGhee v. Moyer*, 60 F.R.D. 578, 584 (W.D.Va.1973).

27. See 409 U.S. at 518, 93 S.Ct. at 858, citing *Poresky* and *Hannis* as authority.

a Three–Judge Court from granting injunctive relief in this case, it would be inappropriate for this Court, under 28 U.S.C. Section 2284, to request the convening of such a Court. *Barthelmes v. Morris*, 342 F.Supp. 153, 159 (D.Md.1972), appeal dismissed June 29, 1972 (4th Cir. 1972); *Sharrow v. Peyser*, 443 F.Supp. 321, 323–324 (S.D.N.Y.1977), aff'd 582 F.2d 1271 (2nd Cir. 1978). However, out of respect for the conscientious and sincere argument by plaintiffs' counsel that the plaintiffs are being flagrantly deprived of their constitutional rights to fully participate in the economic, social, and political life of this State, this Court has reviewed plaintiffs' complaint to determine whether the factual allegations appear to be so compelling, if meritorious, that normal equitable principles governing the relief sought here should be totally disregarded. This Court is sensitive to the argument offered by plaintiffs' counsel that, when justice mandates relief, to delay prompt relief gives substance to the age–old maxim that "justice delayed is justice denied."

■ Of course, as a single judge, this Court is not at liberty to pass upon the merits of the plaintiffs' claims, if such claims present substantial constitutional questions. On the other hand, this Court is charged with the duty to carefully scrutinize all applications seeking the convening of a Three–Judge Court to determine whether such applications are substantial or insubstantial. *Potter v. Meier*, 458 F.2d 585, 589 (8th Cir. 1972); *Cantor v. Supreme Court of Pennsylvania*, 353 F.Supp. 1307, 1314 (E.D.Pa.1973), aff'd, 487 F.2d 1394 (3rd Cir. 1972) (Table).

■ After reviewing the allegations of plaintiffs' Complaint, and considering the arguments of plaintiffs' counsel, it is this Court's opinion that the circumstances of the instant case are not so compelling as to mandate ignoring here the general principles governing equitable relief. This conclusion rests on an analysis of the recent case of *City of Mobile v. Bolden*, —— U.S. ——, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980)—

and a review of the prior Orders of the Three–Judge Court in the *McCollum* case. The explicit findings of the *McCollum* Court that Senate reapportionment was not racially motivated [28] and that Plan A met all relevant constitutional requirements [29] cannot be totally disregarded. The fact that the State of South Carolina has complied in every respect with the guidelines determined by the Court in *McCollum* prevents this Court from reaching an uncontradicted finding of discriminatory intent necessary to overcome the equitable factors previously reviewed. This Court also notes that the State of South Carolina reapportioned the General Assembly promptly after the 1970 decenniel census, which census followed by a few years the establishment in *Reynolds v. Sims, supra*, of the "one man, one vote" principle. The Court has every expectation that the State of South Carolina will act responsibly and meet its constitutional duty by reapportioning the General Assembly after the 1980 census. Nothing suggests that this State, following the 1980 census, will fail to comply with constitutional requirements that redistricting be based on the "one man, one vote" principle and on plaintiffs' rights not to be victimized because of their race. Thus, this Court can find no legal reason, under the circumstances here involved, which would authorize it to completely disregard the well-settled equitable principles heretofore reviewed and seek the convening of a Three–Judge Court in this case. Therefore, it is

ORDERED, that the defendants' motions to dismiss, pursuant to Rule 12(b), Federal Rules of Civil Procedure, be, and the same hereby are, granted, and the Complaint in this action is hereby dismissed.

AND IT IS SO ORDERED.

---

**28.** See note 11, *supra*.

**29.** See note 13, *supra*.