943 P.2d 878

**Richard McCOMB, Mary Johnson, Rachel Villanueva, Dysart Unified School District No. 89, State of Arizona and Sandra Dowling, in her capacity as Superintendent of Schools for Maricopa County, Arizona, Petitioners,**

**v.**

**SUPERIOR COURT of the State of Arizona, In and For the COUNTY OF MARICOPA and the Honorable B. Michael Dann, a Judge of thereof, Respondents,**

**and**

**Rose L. PARKER, Robert F. Koch and Betty Gilomen, Respondents–Real Parties in Interest.**

**No. 1 CA–SA 97–0139.**

Court of Appeals of Arizona, Division 1, Department B.

July 16, 1997.

As Amended July 25, 1997.

Reconsideration Denied Aug. 22, 1997.

Review Denied Sept. 16, 1997.*

* Zlaket, C.J., and Feldman, J., voted to grant re-       view.

Kleinschmidt, J., concurred in part.

Quarles & Brady by Charles W. Herf and Jose L. Martinez, Phoenix, for Petitioners.

Miller LaSota, P.L.C. by Donald M. Peters, Phoenix, for Respondents–Real Parties in Interest.

Jennings, Strouss & Salmon, P.L.C. by Gary L. Lassen and John L. Egbert, Phoenix, for Amicus Curiae Phoenix Union High School District.

## OPINION

LANKFORD, Judge.

The Court accepted jurisdiction in this special action by order on June 10, 1997, with a decision to follow. This is that decision.

The superior court invalidated Arizona Revised Statutes Annotated ("A.R.S.") section 15–431 in its entirety, removed the newly seated members of the board of the Dysart Unified School District ("the district"), and continued the prior incumbents' terms pending a November 1997 special election. We grant partial relief from the trial court's ruling.

The facts, stated briefly, are as follows. In June 1996, the district's board voted to change from an at-large voting system to a single member, or "ward," voting system pursuant to A.R.S. section 15–431.[1] In November 1996, the board held an election utilizing the ward system to fill three vacant seats. Two other seats were not vacant.

Following the election, electors in the school district—the real parties in interest here—challenged the validity of the ward system and of the election. The trial court initially ruled that one part of the statute, section 15–431(B)(3), was unconstitutional, but that this did not justify invalidating the election. After plaintiffs moved for reconsideration, arguing that the statute is unconstitutional in its entirety, the court agreed and invalidated both the statute and the November 1996 election. The court also reseated the prior incumbents and ordered that the

---

1. Section 15–431, enacted in 1990, provides in relevant part:

    A. If, for the prior school year, a school district had an average daily membership of at least one thousand and the total minority enrollment in the district, as reported to the department of education, was at least twenty-five per cent of the total enrollment of the district, the governing board may vote to implement an alternative election system for the election of governing board members....

    B. If the governing board of a school district has implemented a single member district elec-

tion system as provided in subsection A of this section, the system shall be implemented as follows:

    ....

    3. A number shall be assigned to each of the new single member districts in ascending order according to the percentage of the district's minority population in each single member district.

    4. As the terms of the governing board members who were elected at large expire, the members shall be replaced by members who are elected from the single member districts in ascending order of single member district number.

district hold a special election in November 1997 using the at-large election system.

Defendants raise the following issues in their petition for special action:

1) Did the trial court err in ruling that the plaintiffs have standing to bring this cause of action?

2) Did the trial court err in holding section 15–431 unconstitutional?

3) Did the trial court abuse its discretion in declining to dismiss based on laches?

4) Did the trial court abuse its discretion in unseating the newly seated board members and continuing the terms of the incumbents?

The parties agree that we have, and should exercise, our special action jurisdiction. Jurisdiction is appropriate because this case involves the constitutionality of a statute of statewide importance. *See State Compensation Fund v. Symington*, 174 Ariz. 188, 191–92, 848 P.2d 273, 276–77 (1993).

### I.

We first address whether plaintiffs lacked standing to sue the district. Defendants argue that because plaintiffs reside in a district that can choose between alternative election systems, they are benefitted rather than injured by the statute and thus have no standing to challenge it.

▋ The constitutional minimum for standing requires that the plaintiff has suffered an invasion of a legally protected right which is concrete, particularized, actual and imminent; there must be a causal connection between the injury and the conduct complained of, and it must be likely that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 2136–37, 119

L.Ed.2d 351 (1992). As electors who reside in a district in which voting has been structured based on racial discrimination, plaintiffs meet these criteria.

The dissent contends that plaintiffs did not sufficiently allege "injury in fact" to challenge the entire statute.[2] Plaintiffs did allege that they were electors in the district and the applicable case law indicates that this is enough. *E.g., United States v. Hays*, 515 U.S. 737, 745, 115 S.Ct. 2431, 2436, 132 L.Ed.2d 635 (1995) ("Where a plaintiff resides in a racially gerrymandered district, . . . the plaintiff has been denied equal treatment because of the legislature's reliance on racial criteria, and therefore has standing to challenge the legislature's action.") (quoted in *Bush v. Vera*, 517 U.S. 952, ——, 116 S.Ct. 1941, 1951, 135 L.Ed.2d 248 (1996)).

While the plaintiffs may not have pled their injury in detail, the injury was apparent from the complaint and other pleadings.[3] Although this is not a case in which district boundary lines were redrawn, it does involve the division of a single district into multiple districts. The result is a clear "injury in fact" sufficient for standing. *See Hays*, 515 U.S. at 743, 115 S.Ct. at 2435. The plaintiffs can no longer vote for all five board members; they can vote for only one. The plaintiffs cannot vote in all board elections; they now may vote only in the elections involving their own single member district. This is ample injury to show standing. *See Smith v. Boyle*, 959 F.Supp. 982, 985 (C.D.Ill.1997) (residing in a district using at-large voting conferred standing). The plaintiffs' injury is obvious, and accordingly they have standing to sue.

Finally, the dissent maintains that plaintiffs were uninjured because they resided in a district that merely had the "option" of switching to a ward system. We disagree.

---

**2.** The dissent acknowledges that two plaintiffs had standing to challenge subsection B because they could not vote in the last election. However, even the remaining plaintiff suffers injury because she is disenfranchised in future elections. That injury is no less concrete because it is prospective.

**3.** Not only is the injury apparent, but plaintiffs alleged, as the dissent acknowledges (although

only with regard to subsection B), that an inability to vote in some elections constituted an injury. Plaintiffs claimed that the voting system "dilute[d]" their votes and used race as a basis for determining "who will vote and when." Even the school district understood that plaintiffs were complaining that they were "disenfranchised," as shown by the affidavit of school official Jesus de la Garza.

Plaintiffs are injured by the ward system voting itself. The single member district system is no longer an option; it is reality. As described above, that voting method clearly affects their voting rights. Plaintiffs are injured and have standing to complain of that injury.

## II.

We next consider whether A.R.S. section 15–431 is unconstitutional in its entirety. First, defendants assert that plaintiffs waived this argument because they first raised it in their motion for reconsideration.

■ We find no waiver. The complaint framed a broad challenge to the validity of section 15–431 in its entirety.[4] In paragraph twenty of their complaint, plaintiffs claimed as follows:

> 20. Plaintiffs are entitled to declaratory relief that (a) the recent elections were violative of Arizona law and void, (b) that A.R.S. § 15–431 contravenes the Arizona Constitution and applicable federal law and is therefore void, and (c) that the boundaries of the District's wards are invalid.

Elsewhere in their complaint, the plaintiffs also alleged that "some citizens ... were denied any opportunity to vote because of their race[ ]...." In addition, although the motion for summary judgment focused on one provision of the statute, the trial court had the discretion to consider the validity of the whole statute on reconsideration.[5] *See* UNIF. R. SUP.CT. P. 4(h). We find no reason—and the dissent produces no reason—to hold that trial judges lack the discretion to reconsider their own rulings.

■ Second, defendants maintain that the trial court erred in ruling that section 15–431 is unconstitutional. After reviewing the statute, we too find it unconstitutional. Section 15–431 is explicitly race-based, mandat-

ing strict scrutiny review. *See Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 227–29, 115 S.Ct. 2097, 2113, 132 L.Ed.2d 158 (1995). In order to satisfy such strict review, the proponent of the statute must show that it is narrowly tailored to further a compelling state interest. *Id.* The statute fails to survive strict scrutiny.

■ No compelling interest that justifies the racial discrimination of section 15–431 was shown. Defendants claim that compliance with sections 2 and 5 of the Voting Rights Act mandated the enactment of the statute. Compliance with section 5 is not a sufficiently compelling interest. *Miller v. Johnson,* 515 U.S. 900, 919–23, 115 S.Ct. 2475, 2490–91, 132 L.Ed.2d 762 (1995). Furthermore, compliance with section 2 may be a compelling interest only where the State seeks to remedy "identified discrimination" and where the State has "a strong basis in evidence" that remedial action was necessary. *Bush,* 517 U.S. at –––––, 116 S.Ct. at 1962–63.

■ The record contains no evidence of historic racial discrimination. Our review of the legislative history reveals that the legislature enacted this statute in response to past litigation—i.e., mere *claims* of discrimination—involving two other school districts. A lawyer for plaintiffs suing one of the school districts testified before the legislature that the need for this statute was supported by the fact that an all anglo board governed a district with a fifty-five percent minority population. However, this is not the required "strong evidence." First, these are the assertions of an advocate, unsupported by any documentation or witnesses. Second, the legislative record fails to show any concurrence by the legislature in these assertions. Third, even if the assertions were true, they would not establish racial discrimination. *Cf. Rogers v. Lodge,* 458 U.S. 613, 624–27, 102

---

4. Arizona is a notice pleading state. *E.g., Rosenberg v. Rosenberg,* 123 Ariz. 589, 592–93, 601 P.2d 589, 592–93 (1979). Courts do not require extensive fact pleading. *Id.* Plaintiffs' broad claim that A.R.S. section 15–431 is unconstitutional encompasses the contention that the entire statute is unconstitutional.

5. Contrary to the dissent's suggestion, we find nothing which misled or prevented defendants from offering evidence. Defendants had the opportunity to contest plaintiffs' motion for reconsideration—which raised the constitutional invalidity of the entire statute and specifically pointed out the absence of any justification for racial discrimination—by written response and at the hearing held on the motion.

S.Ct. 3272, 3279–81, 73 L.Ed.2d 1012 (1982) (petitioner provided extensive and detailed information on minorities' historical participation in the political process as well as statistics concerning the socioeconomic status of minorities in the county); *Parnell v. Rapides Parish Sch. Bd.*, 425 F.Supp. 399, 405 (W.D.La.1976), *modified*, 563 F.2d 180 (5th Cir.1977) ("The constitutional insufficiency ... is not demonstrated solely by showing that the cognizable minority has not been able to elect officials in ... mathematical proportion to its voting potential.") It is important to acknowledge that it might have been possible to provide such evidence when the statute was enacted, and it might be possible to produce it today. Until that is done, however, a race based statute cannot stand.

■ We are left with the State's interest in avoiding litigation. Avoidance of litigation is not a compelling interest. Accordingly, there is no proof that the statute serves a compelling interest. It cannot satisfy strict scrutiny and is unconstitutional.

■ Section 15–431 is also unconstitutional because it is not narrowly tailored. Even if discriminatory voting practices in *some* districts justified enactment of the statute, section 15–431 contains no mechanism limiting it to such circumstances. Instead, section 15–431 can be applied more broadly than situations involving identifiable racial discrimination. Thus, even if there were some historical racial discrimination in Arizona school board voting, Dysart has no history of discrimination. Its implementation of a statute enacted to protect minority voting rights indicates that section 15–431 was not narrowly tailored to meet the specific interest for which it was enacted. *Cf. Bush*, 517 U.S. at ——, 116 S.Ct. at 1963 ("A reapportionment plan would not be narrowly tailored

to the goal of avoiding retrogression if the State went beyond what was reasonably necessary to avoid retrogression.") (quoting *Shaw v. Reno*, 509 U.S. 630, 655, 113 S.Ct. 2816, 2831, 125 L.Ed.2d 511 (1993)). Because the statute is not narrowly tailored to serve a compelling interest, it is unconstitutional.

■ Finally, even if only subsection (B)(3) is unconstitutional as defendants argue, the statute must fall because that subsection is not severable. Generally, an entire statute need not be declared unconstitutional if the unconstitutional portions can be severed. *E.g., Symington*, 174 Ariz. at 195, 848 P.2d at 280. However, an entire statute is invalid "where the constitutional and unconstitutional provisions are so connected and interdependent in subject matter, meaning and purpose as to ... justify the conclusion that the legislature intended them as a whole and would not have enacted a part only." *Id.* (quoting *Millett v. Frohmiller*, 66 Ariz. 339, 343, 188 P.2d 457, 460 (1948)).

■ Section 15–431 is ineffectual without subsection (B)(3). Without that part of the statute, there is no means to determine which of the single member district seats will take office. Because the board members' terms are staggered, *see* A.R.S. section 15–427(B), some method of selection is essential. The single member system simply cannot be implemented without a provision indicating how the staggered at-large seats will be filled. Thus, section 15–431 is not severable, and the entire statute is invalid even if only subsection (B)(3) is unconstitutional.[6]

## III.

We next consider whether laches mandated the dismissal of plaintiffs' claims. Defen-

---

6. The dissent concludes that section 15–431(B) is severable because subsection A contemplates switching to systems other than ward systems, and methods of implementation other than the one set forth in subsection B could have been adopted. However, the fact that other methods of implementation *could* have been adopted means nothing. We do not know what these other systems are. The statute suggests none. The legislative history provides for none. We cannot invent an alternative measure. Subsec-

tion C of the statute, which the dissent cites, simply does not apply: It applies only to implementation of unspecified alternatives to ward voting. For us to assert the power to specify an alternative method of implementation for ward voting would transform this Court into a legislative body. Because there is no nondiscriminatory alternative to subsection B, the whole statute depends on that provision for implementation and, accordingly, the entire statute must fall.

dants contend that plaintiffs intentionally delayed the bringing of this suit, thereby causing actual prejudice to defendants and requiring dismissal.

■ A finding of laches is within the sound discretion of the trial court. *E.g.*, *McFadden v. Wilder*, 6 Ariz.App. 60, 64, 429 P.2d 694, 698 (1967).[7] Absent erroneous interpretation of the law or clearly erroneous factual underpinnings, "the [trial court's] determination can be overturned only if [its] decision represents an unreasonable judgment in weighing relevant factors." *E.g.*, *A.C. Aukerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020, 1039 (Fed.Cir.1992). The trial court did not abuse its discretion in declining to apply laches.

■ In order to bar a claim on the basis of laches, a court must find more than mere delay in the assertion of the claim. "The delay must be unreasonable under the circumstances, including the party's knowledge of his or her right, and it must be shown that any change in the circumstances caused by the delay has resulted in prejudice to the other party sufficient to justify denial of relief." *Mathieu v. Mahoney*, 174 Ariz. 456, 459, 851 P.2d 81, 84 (1993) (holding challenge to initiative barred by laches because plaintiffs waited one year to take any action).

The trial court's finding that plaintiffs' delay was not unreasonable is supported by the record. Plaintiffs admittedly did not file their claim until after the election. However, the trial court acted within its discretion in deciding that plaintiffs acted reasonably under the circumstances. The Second Restatement of Torts, in defining "reasonable delay," recognizes that plaintiffs are "entitled to take time for an investigation," and "protests, complaints and negotiations looking toward a settlement of the controversy, go far to explain the reasonableness of the delay." RESTATEMENT (SECOND) OF TORTS § 939 cmt. b (1977); *see also Toney v. White*, 488 F.2d 310, 315 (5th Cir.1973) (en banc) (no laches unless defendant can "show by clear and convincing proof that there was in fact a deliberate bypass of a pre-election judicial remedy").

The facts relevant to the laches issue are these. The district voted to change to a ward system in June 1996. Plaintiffs immediately requested documents from the district and objected in the United States Justice Department Voting Rights Act approval process. When the Justice Department approved the district's change on August 16, 1996, plaintiffs solicited an opinion from the Arizona Attorney General. Plaintiffs continued their non-judicial challenges to the board's decision until they filed their complaint on November 25, 1996, just 20 days after the election.

■ The proper remedy prior to the election would have been an injunction. *See Bearup v. Voss*, 142 Ariz. 489, 490, 690 P.2d 790, 791 (App.1984). In order to obtain this remedy, however, plaintiffs would have had to file suit before the ballots were printed. *See Hunt v. Superior Court*, 64 Ariz. 325, 329, 170 P.2d 293, 295–96 (1946). Absentee ballots must be prepared and delivered to the officer in charge of the election not later than the thirtieth day preceding the Saturday before the election. A.R.S. § 16–545. Therefore, the ballots must be printed prior to the commencement of absentee voting, and plaintiffs would have had to file their suit and obtain injunctive relief prior to printing, at or before the beginning of October. It hardly seems unreasonable for plaintiffs not to have attempted this very difficult if not impossible task. Based on these circumstances, the trial court could decide that plaintiffs had an "adequate explanation" for the delay, that their delay was not unreasonable, and that laches should not bar their claim. *See Soules v. Kauaians for Nukolii Campaign Comm.*, 849 F.2d 1176, 1180 (9th Cir.1988).

■ The dissent maintains that plaintiffs should have filed suit before the election. As a practical matter, however, there was very little time in which to do so. Moreover, the trial judge was entitled to consider more

7. Courts may provide relief in whole or in part upon a finding of laches. *E.g.*, RESTATEMENT (SECOND) OF TORTS § 939 cmt. c (1977); *A.C. Aukerman* *Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020, 1039–40 (Fed.Cir.1992).

than the single fact of when the lawsuit was filed. The judge could consider all of plaintiffs' activities, including their efforts outside litigation, to resolve the conflict. Laches does not require, as the very first course of action, that the plaintiff file a lawsuit.

The dissent seeks support in *Barthelmes v. Morris*, 342 F.Supp. 153 (D.Md.1972), which held that seeking relief through legislative channels did not excuse plaintiffs' delay in filing a lawsuit. However, to the extent that *Barthelmes* stands for the proposition that plaintiffs' efforts outside litigation cannot be considered, that case contradicts the Restatement, which accepts "protests, complaints and negotiations" as indications of reasonable delay. RESTATEMENT (SECOND) OF TORTS § 939 cmt. c (1977). We follow the Restatement in the absence of any Arizona law to the contrary. *E.g., Aztlan Lodge No. 1, Free and Accepted Masons of Prescott v. Ruffner*, 155 Ariz. 163, 165, 745 P.2d 611, 613 (App.1987). Because the Restatement addresses what constitutes "reasonable delay," and Arizona courts have been silent on this issue, we follow it and not *Barthelmes*. Plaintiffs' actions—protesting to the Department of Justice and requesting an opinion from the Attorney General—support the trial judge's determination not to apply laches.

Nor is *Tilson v. Mofford*, 153 Ariz. 468, 737 P.2d 1367 (1987) *persuasive*. In *Tilson*, our supreme court addressed the legality of a proposed initiative and held that "the procedures leading up to an election cannot be questioned after the people have voted[ ]...." *Id.* at 470, 737 P.2d at 1369 (citing *Kerby v. Griffin*, 48 Ariz. 434, 444-46, 62 P.2d 1131, 1135-36 (1936)). The court defined the procedures, or "electoral process," as "the manner in which an election is held," and stated that its authority to intervene before an election is limited to situations in which "an initiative petition is defective in form or does not bear the number of signatures of qualified electors required by [the constitution], or where the prescribed procedure has not been followed." *Id.* (quotation omitted). The court concluded that it had the authority to review violations in the election *process* before the election, but could not review violations in the *substance* of an initia-

tive until it was adopted and later challenged. *Id.* at 471, 737 P.2d at 1370.

In both *Tilson* and *Kerby*, actions for injunctive relief were filed before the election. Thus, any statement about post-election remedies is necessarily dictum. Moreover, both cases are distinguishable because they involved "the manner in which an election is held": in *Kerby*, the failure to circulate publicity pamphlets and in *Tilson*, an alleged defect in the pamphlets and a violation of the single subject rule. *See* ARIZ. CONST. art. 21, § 1.

Here, plaintiffs do not challenge election procedures; they challenge the constitutional validity of A.R.S. section 13-431. *Tilson* does not preclude substantive review of an election statute after the election has been held.

■ Nor does *Hendon v. North Carolina State Bd. of Elections*, 710 F.2d 177 (4th Cir.1983), bar relief. "*Hendon* does not set forth a *per se* rule; rather, courts must determine each such election case against the general rule established in *Hendon* that a candidate or other election participants should not be allowed to ambush an adversary or subvert the election process by intentionally delaying a request for remedial action to see first whether they will be successful at the polls." *United States v. City of Cambridge, Maryland*, 799 F.2d 137, 141 (4th Cir.1986).

### IV.

Defendants' final contention is that the trial court improperly removed the newly seated board members and continued the terms of the incumbents pending a new election. Petitioners do not contest that the election, if unconstitutional, should have been voided and the court should have ordered a new election. Petitioners only argue that the remedy that the court fashioned for the interim was the wrong remedy.

■ The fashioning of a remedy is an exercise of equitable power within the trial court's discretion. *Lemon v. Kurtzman*, 411 U.S. 192, 200, 93 S.Ct. 1463, 1469, 36 L.Ed.2d 151 (1973). Our review is correspondingly

narrow and is limited to abuse of this discretion. *Id.;* Kenneth W. Starr, *Federal Judicial Invalidation as a Remedy for Irregularities in State Elections,* 49 N.Y.U. L. REV. 1092, 1100 (1974).

The court had only two choices: 1) Keep the unlawfully elected board members in office and affirm the validity of their actions, or 2) continue the former members in office and disqualify the unlawful board members. Courts have adopted both approaches. In *Ury v. Santee,* 303 F.Supp. 119, 126–27 (N.D.Ill.1969), the court continued the terms of the incumbent officers until the special election. *See also Hamer v. Campbell,* 358 F.2d 215, 222 (5th Cir.1966) (invalidating election because it should have been previously enjoined); *Coalition for Educ. in Dist. One v. Board of Elections of the City of New York,* 370 F.Supp. 42, 56–58 (S.D.N.Y.) (voiding discriminatory election and ordering new election upon finding that equities warranted remedy and plaintiffs acted diligently in asserting their rights), *aff'd,* 495 F.2d 1090 (2d Cir.1974). However, other courts have provided only prospective relief to plaintiffs bringing post-election challenges. *See Hendon,* 710 F.2d at 182; *Toney,* 488 F.2d at 315–16. Trial courts generally have the discretion to select either remedy.

In this case, however, the Arizona Constitution instructed the judge which approach to adopt. The Arizona Constitution directed the continuation of the board membership in the following provision:

> Section 13. The term of office of every officer to be elected or appointed under this Constitution or the laws of Arizona shall extend until his successor shall be elected and shall qualify.

ARIZ. CONST. art. 22, § 13. In *McCall v. Cull,* 51 Ariz. 237, 242, 75 P.2d 696, 698–99 (1938), our supreme court held that an incumbent's tenure of office continues until his successor qualifies, although his term has expired.

The newly seated Dysart board members were elected under an unconstitutional system, and were therefore not validly "elected." Until their successors are validly elected, the incumbents may continue to occupy the school board offices. *Cf.* Op. Att'y Gen. No. I85–073 (1985) (outgoing local governing board members are to remain in office after their terms expire and until their newly elected successors have qualified by subscribing to oath of office). The trial court merely applied the constitutional provision, extending the terms of the incumbents until the special election. There is no abuse of discretion in following the mandatory constitutional provision.

Even if the constitution were not mandatory, the trial court did not abuse its discretion. It is difficult to see how it is a greater evil to continue the incumbents' terms than to bestow governmental authority upon unlawfully elected officers. Such a remedy is no less democratic and no more disruptive than affirming the authority of the unlawfully elected officials.[8] Therefore, the trial court did not abuse its discretion in continuing the incumbents in office.

V.

In sum, Judge Kleinschmidt and I agree that plaintiffs have standing and that A.R.S. section 15–431 is unconstitutional in its entirety. Judges Kleinschmidt and Fidel agree that, because of laches, the remedy should be limited to ordering a future election. Accordingly, we order that relief be granted in part: the part of the trial court's order invalidating the election and continuing the terms of the former board members is vacated.

KLEINSCHMIDT, Presiding Judge, concurring in part.

I disagree with Judge Lankford in only one respect. I think the trial judge abused his discretion in removing the members of the board who were elected at the last election and ordering the prior holders of those seats to resume office. The only proper remedy under the facts of this case is to give nothing more than prospective effect to the invalidation of the statute.

---

8. One of the incumbents has died. The trial court correctly ruled that the vacancy can and should be filled in accordance with applicable Arizona law.

Article 22, section 13 of the Arizona Constitution, which provides that the term of office for every elected officer shall extend until his successor is elected and qualified, does not appear to apply to this situation. The provision does not address what happens if a statute which governs an election is invalidated long after the election has taken place.

There is, however, case law that does prescribe the proper remedy for this problem. In *Hendon v. North Carolina State Bd. of Elections,* 710 F.2d 177 (4th Cir.1983), the court concluded that certain state election laws were unconstitutional. Those who had challenged the election law had no explanation as to why they had not brought suit until after the election had taken place. The court held that under those circumstances, the election should not be set aside and that the challengers were entitled to prospective relief only. *Id.* at 182; *see also Toney v. White,* 488 F.2d 310, (5th Cir.1973) (vacating order requiring special election as relief for unconstitutional election because the next regular election was only five months away). *See generally* Kenneth W. Starr, *Federal Judicial Invalidation as a Remedy for Irregularities in State Elections,* 49 N.Y.U. L.Rev. 1092 (1974).

Laches should not be applied to preclude all relief for the plaintiffs. The time between the board's adoption of the ward system and the election was relatively short. The delay in bringing the suit was explained and was not wholly unreasonable. On the other hand, the facts do not warrant the disruption of removing board members from office. The statute we now hold unconstitutional was adopted in good faith by the legislature in response to pressure from the federal government, and the school board and the candidates, in attempting to follow it, were indisputably acting in good faith. Under these circumstances, it was an abuse of discretion for the trial judge to select the harshest remedy available. The members of the board should remain in office and subsequent school board elections should be conducted by voting at large, unless and until the legislature, in a manner consistent with the Constitution, provides for a different method.

FIDEL, Judge, concurring in part and dissenting in part.

## I. LACHES

In *Kerby v. Griffin,* 48 Ariz. 434, 446, 62 P.2d 1131, 1136 (1936), the Arizona Supreme Court explained in an adage why parties who object to the manner in which an election will be held must seek to enjoin the election before it occurs and may not seek to overturn it after the fact: "An ounce of prevention is worth a pound of cure." In this case, because Plaintiffs waited until after the election to file suit, the trial judge, finding merit in their challenge, lacked the ability to enjoin the election before it occurred. Instead, he found it necessary to declare the election invalid; order two of the victors out of office; order one of the victors to continue service not as a victor but as a temporary holdover from the prior board; dragoon a second prior board member back to temporary service, though that member had chosen not to stand for reelection; order the District to temporarily fill the third seat, as death had placed its prior occupant beyond the summons of the court; and order the District to fill all three seats by convening a special at-large election in November 1997. This was a pound of cure indeed.

I would hold that the trial court abused its discretion by entertaining Plaintiffs' suit. The trial court should have dismissed for "laches"—unreasonable and prejudicial delay in filing suit. *See Mathieu v. Mahoney,* 174 Ariz. 456, 459, 851 P.2d 81, 84 (1993). Electoral challenges must be processed expeditiously. These plaintiffs waited too long to file this suit.

Arizona courts and others have rejected as dilatory electoral suits that were filed *before* election but so close as to disrupt the candidates, the voters, or the electoral process. *See, e.g., Mathieu,* 174 Ariz. at 460–61, 851 P.2d at 85–86; *Fulani v. Hogsett,* 917 F.2d 1028, 1031 (7th Cir.1990); *Kay v. Austin,* 621 F.2d 809, 813 (6th Cir.1980); *MacGovern v. Connolly,* 637 F.Supp. 111, 115 (D.Mass. 1986); *Barthelmes v. Morris,* 342 F.Supp.

153, 154–55 (D.Md.1972). Stressing the importance of resolving electoral challenges before the electoral machinery is set in gear, *Fulani* stated, "As time passes, the state's interest in proceeding with the election increases in importance as resources are committed and irrevocable decisions are made." 917 F.2d at 1031 (quoting *Kay*, 621 F.2d at 813).

A state interest that strengthens as an election approaches strengthens vastly as the election recedes into the past. To nullify a school board election after the fact frustrates the candidates and their supporters, who invested time, money, effort, and public spirit in a vain pursuit; the voters, who informed themselves, participated in the election, and attempted to shape policy through their votes; the public, who financed the election to no end; and district employees, students, parents, and residents, who find their school board destabilized, its members dispirited, and the validity of its acts, plans, and decisions placed in doubt. *See Donaghey v. Attorney General*, 120 Ariz. 93, 95, 584 P.2d 557, 559 (1978) (electoral challenges months after an election "erode the stability of ... governments by calling into question the legitimacy" of interim acts).

For this reason, the Arizona Supreme Court has held since statehood that "the procedures leading up to an election cannot be questioned after the people have voted, but instead the procedures *must* be challenged before the election is held." ˙ *Tilson v. Mofford*, 153 Ariz. 468, 470, 737 P.2d 1367, 1369 (1987) (citing *Kerby*, 48 Ariz. at 444–46, 62 P.2d at 1135–36); *see also Allen v. State*,

14 Ariz. 458, 130 P. 1114 (1913).[9] I see no basis in this record for departing from this bright-line rule.

The District gave public notice in February 1996 that it contemplated changing from at-large to ward elections. One of the plaintiffs, well informed from the outset, attended public hearings and spoke in opposition to the plan. On June 27, 1996, when the District formally adopted the ward plan, more than four months remained before the election, which was scheduled for November 5, 1996. This period, though compressed, was adequate to permit Plaintiffs to bring suit and achieve a resolution before the election. *See Perini Land & Dev. v. Pima County*, 170 Ariz. 380, 382, 825 P.2d 1, 3 (1992) (the courts will employ expedited procedures to resolve election cases before an upcoming election).

Plaintiffs offer two reasons—neither persuasive—for waiting until after the election to bring suit. The first is that they hoped to derail the plan through pending studies by the United States Justice Department and the Attorney General of Arizona, and reserved a lawsuit as the last resort.[10] The *Barthelmes* court, applying laches to a suit filed eight weeks *before* the election, rejected a comparable explanation, stating:

> The fact that [the plaintiffs] first sought redress through legislative change was an election on their part which affords no valid excuse for the .delay. They do not nor could they contend that this challenge could not have been mounted in the courts before it became apparent that relief would not be forthcoming through the legislative process.

---

**9.** In requiring pre-election challenges to the "procedures leading up to an election," the *Tilson* court implicitly distinguished challenges to illegal voting, misconduct in the vote count, and similar irregularities in the course of an election. 153 Ariz. at 470, 737 P.2d at 1369. As such irregularities, by their nature, cannot be challenged in advance, Arizona law permits them to be challenged on a highly expedited basis after the election. *See* Arizona Revised Statutes Annotated ("A.R.S.") § 16–671 *et seq.* (1996).

**10.** Plaintiff Koch indicated by affidavit that he and another opponent of the ward system, aware that the Justice Department was considering

whether to pre-certify the election pursuant to the Voting Rights Act, stated their objections "in a lengthy written submission to the Justice Department." According to Koch, it was only after the Justice Department approved the impending election on August 16, 1996, "that those of us who were opposed to the change began to consider court action." Further, Koch added, "in August, through our state legislators, we sought an opinion from the Attorney General regarding certain aspects of the proposed change." The Attorney General's opinion was not forthcoming until October 15 and did not persuade the District to alter its approach.

342 F.Supp. at 160.[11]

The lead opinion argues that we should not be guided by *Barthelmes* on this point but instead should follow the Restatement (Second) of Torts § 939 cmt. b (1977), which provides that "protests, complaints and negotiations looking toward a settlement of the controversy, go far to explain the reasonableness of the delay." I disagree. The Restatement's comment, though persuasive in assessing delay in a tort dispute between private parties, is unpersuasive in assessing delay in a challenge to a popular election. As *Mathieu* reminds us, "public litigation, such as election contests and challenges to ballot propositions, implicates interests well beyond the parties to the case. Litigants and lawyers involved in such litigation must be keenly aware of the need to bring such cases with all deliberate speed...." 174 Ariz. at 460, 851 P.2d at 85.

Plaintiffs' second explanation is that they could not "raise the money for a legal evaluation" until the middle of October. But our supreme court rejected the identical explanation in *Mathieu*, stating, "[m]ere financial inability to prosecute a suit is not an excuse for an unreasonable delay." 174 Ariz. at 460, 851 P.2d at 85 (quoting *Price v. Sunfield*, 57 Ariz. 142, 149, 112 P.2d 210, 213 (1941)).

Plaintiffs finally argue that, even if their reasons for delay are not persuasive, we should nonetheless resist applying laches because the merits of their case need resolution. They state:

> This case ... concerns the constitutionality of a statute which applies on a continuing basis to school districts throughout the state. Any other school district in Arizona could decide tomorrow to do what the District has done. Were this Court to refrain from deciding the issues in this case on procedural grounds, the issues would remain. They would still require adjudication. The Court would simply be nullifying all of the effort that has gone into this case and compelling a new set of litigants and judges to start from scratch.

Chief Justice Feldman, dissenting in *Mathieu*, expressed a similar reluctance to avoid the merits of "significant issues of public concern ... by raising a shield called laches." *Id.* at 463, 851 P.2d at 88. But that viewpoint, however forceful, did not prevail in *Mathieu*, which was filed before the election. When, as here, suit has been delayed until after the election, the countervailing considerations are much stronger. Plaintiffs, who ask us not to nullify their legal efforts, ask us instead to nullify a popular election.

Judicial power to oversee the conduct of elections is inherent in judicial review, as our supreme court long ago explained: "[T]o hold a court of equity could not intervene to prevent an election being held, when every constitutional and statutory provision setting forth what must be done before holding a legal election had been violated, would result in an absurdity." *Kerby*, 48 Ariz. at 444, 62 P.2d at 1135. But because the power to oversee elections entails the power to frustrate popular will, we must exercise it with restraint. Just as we oblige ourselves to resolve electoral cases with extraordinary expedition to minimize the disruptive effect of our review, we must demand comparable expedition from those who bring such cases. Our supreme court has told us that electoral procedures "*must* be challenged before the election is held." *Tilson*, 153 Ariz. at 470, 737 P.2d at 1369 (emphasis in text); *see also Kerby*, 48 Ariz. at 444–46, 62 P.2d at 1135–36. This requirement is an important element of judicial self-restraint, and we ought to apply it here.

## II. STANDING

My position on laches is that the trial court should not have entertained any part of Plaintiffs' suit. Assuming the contrary, however, I would hold that Plaintiffs established standing only to attack subsection B of A.R.S. § 15–431 and lack standing to attack the rest.

In *United States v. Hays*, 515 U.S. 737, 115 S.Ct. 2431, 132 L.Ed.2d 635 (1995), the

---

11. Plaintiffs cite *McCarthy v. Askew*, 420 F.Supp. 775 (S.D.Fla.), *aff'd*, 540 F.2d 1254 (5th Cir. 1976), in which the court declined to apply laches, holding that the plaintiffs had reasonably sought legislative redress before filing suit. There, however, the plaintiffs did not wait until after the election to file suit; they filed suit more than three months before. *Id.* at 777–78.

## 531

Supreme Court set forth the elements of standing:

> It is by now well settled that the irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of.... Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Id.* at 743, 115 S.Ct. at 2435 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992)).

*Hays* also placed the burden on the party seeking standing "clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute." *Id.* (quoting *Warth v. Seldin*, 422 U.S. 490, 518, 95 S.Ct. 2197, 2215, 45 L.Ed.2d 343 (1975)).

### A. Injury in Fact

As it was Plaintiffs' burden under *Hays* to identify, concretely and with particularity, the "injury in fact" that they attributed to A.R.S. § 15–431, it is our burden to examine, concretely and with particularity, the injury that they specified and the portion of the statute that they designated as its source.

Two portions of A.R.S. § 15–431 engage in racial classification; they differ greatly in function and effect, and the difference is highly significant to the question of "injury in fact." Subsection A identifies certain Arizona school districts—those with minority enrollment of twenty-five percent or more—

that are extended the option to elect their governing boards by a method other than election at-large. One option extended pursuant to subsection A is to elect representatives by ward.

Subsection B applies only to districts that have received and chosen to exercise the option to shift from elections at-large to elections by ward.[12] As a transitional means to enable such districts to retain staggered terms for members of their boards, subsection B directs that wards with the highest minority concentrations shall vote in the first post-transitional election, and that the remaining wards, those with lower minority concentrations, must await the second. *See* A.R.S. § 15–431(B)(4).

Plaintiffs, recognizing their burden under *Hays*, identified their "injury in fact" with admirable particularity. In not a single allegation of their complaint did they claim to have been injured by (a) the legislature's decision in A.R.S. § 15–431(A) to extend their school district the option to switch from at-large to ward elections or (b) the District's decision under § 15–431(A) to exercise that option.[13] The injury that Plaintiffs identified arose entirely from the transitional machinery established in § 15–431(B): thereunder, two of the three plaintiffs were obliged, through the application of a racial criterion, to wait two years before they could take advantage of the change and elect *their ward representative* to the board. To spell this out more particularly, wards 1, 2, and 3—those with the highest percentages of minority population—were designated to elect ward representatives in the 1996 election; wards 4 and 5—those with lower minority percentages—were obliged to wait until 1998. Plaintiffs, two of whom lived in ward 5, alleged

---

**12.** Subsection 15–431(B) provides in relevant part:

> B. If the governing board of a school district has implemented a single member district election system as provided in subsection A of this section, the system shall be implemented as follows:
> ....
> 3. A number shall be assigned to each of the new single member districts in ascending order according to the percentage of the district's minority population in each single member district.

4. As the terms of the governing board members who were elected at large expire, the members shall be replaced by members who are elected from the single member districts in ascending order of single member district number.

**13.** Plaintiffs did assert that the District had improperly drawn the lines of its five wards. As the litigation advanced, however, Plaintiffs abandoned this allegation and focused solely on the transitional voting priority that was granted to three of the five wards and the subsidiary voting priority assigned to the remaining two.

that this delay "abridged [their] right to vote on account of ... plaintiffs' race or color." The complaint alleged no other "injury in fact."

Contemporaneously with their complaint, Plaintiffs undertook in an "Opening Memorandum of Law" to summarize the issues for the court. This memorandum, from the opening line, defined the transitional voting scheme of subsection B as the source of Plaintiffs' injury. It began, "Plaintiffs' central argument is that, in the elections in question, *voting priority* was given to some citizens and denied to others on the basis of race." (Emphasis added.) It continued:

> At issue is A.R.S. § 15–431*(B)*, which specifies the procedure by which a change to a ward system must be implemented.... As the terms of school-board members elected under the at-large system expire, they are to be replaced on a staggered basis by members elected from a single [ward]. *Who gets to vote first depends upon the minority population within each [ward].*

(Emphasis added.)

Plaintiffs went on to identify their injury as the dilution of their vote and the abridgment of their suffrage as members of lower priority wards:

> The plain effect of such a system is to dilute the vote of the racial group which is assigned a lower priority.
>
> . . . .
>
> It cannot be disputed that *those who were not allowed to vote in the recent elections because of their race suffered an abridgement in suffrage.*[14]

(Emphasis added.) They then demanded, to prevent such defects in future elections, that the District be "restrained from continuing to use race as a basis for deciding who will vote and when."

Plaintiffs' motion for summary judgment is equally telling. The trial court, after meeting with counsel and narrowing the issues, directed them to file memoranda by a date certain "concerning the remaining issues in this case." The parties responded with cross-motions for summary judgment. Plaintiffs' motion focused exclusively on A.R.S. § 15–431(B). Quoting subsection B, parts (3) and (4), in their entirety, the motion stated, by way of summary of the argument, that "to confer priority in voting [among wards] on the basis of race violates both the United States and Arizona constitutions, as well as certain federal statutes." The motion went on to argue specifically that the race-based prioritization of wards in subsection B could not survive strict scrutiny, was unjustified by any showing of past discrimination, and was unnecessary, in any event, because the legislature could have established non-racial "workable alternatives for effecting ... a transition ... [without] abridg[ing] anyone's right to vote in the process."[15] The motion made no such argument with respect to subsection A; it made no argument whatsoever with respect to subsection A.

I dwell on Plaintiffs' trial court pleadings because they highlight how narrowly Plaintiffs defined their "injury in fact." Plaintiffs never alleged that they were injured by the legislature's extension of an option in subsection A for their district to shift to a ward system of voting; nor did they argue that they were injured by the District's decision to shift from at-large to ward voting. They alleged only that they were injured by the abridgement of suffrage that they experienced as residents of a disfavored ward pursuant to subsection B. By so defining their claim of injury, Plaintiffs commensurately defined and limited their standing "to invoke judicial resolution of the dispute." *Hays*, 515 U.S. at 743, 115 S.Ct. at 2435.

14. As indicated, only two of the plaintiffs experienced this abridgment of suffrage. The third, who lived within favored ward 3, identified no injury at all.

15. Plaintiffs sounded the same theme in responding to Defendants' motion for summary judgment. Spelling out the kind of "workable alternative" they had in mind, Plaintiffs argued that

the legislature could have ordered simultaneous elections in all wards. Staggered terms could have been retained by assigning some ward representatives initial two-year terms and the others four-year terms. In this way, Plaintiffs argued, *"Every legitimate interest of the state could have been served without any use of racial classifications."*

## B. Motion for Reconsideration

Until the trial court granted them summary judgment, Plaintiffs not only ignored subsection A; they implicitly accepted its validity. They did so throughout the pleadings that I have described. They did so when they argued in their motion for summary judgment that the legislature could have "effect[ed] a transition from an at-large system to a ward system" by various "workable alternatives" without creating "favored and disfavored groups of voters" or "abridg[ing] anyone's right to vote." They did so in response to Defendants' motion for summary judgment when they outlined one such workable transitional alternative whereby "[e]very legitimate interest of the state could have been served without any use of racial classifications."

Given these arguments, it should have come as no surprise that the trial court confined its initial ruling to subsection B and found it severable from the remainder of the statute. Nor should it have come as a surprise that the trial court directed its remedial attention to the single "injury in fact" that Plaintiffs asserted—the abridgment of the suffrage of the residents of wards 4 and 5 who were forced to wait to vote.[16]

Plaintiffs got what they asked for. But it was not what they wanted. In a motion for reconsideration, they attempted to persuade the court to strike the entirety of § 15–431. They argued first that subsection B was unseverable from the remainder of the statute and rendered the remainder unenforceable. Alternatively, they argued that subsection A, if examined independently from subsection B, was rendered unenforceable by an independent racial classification—the restriction to districts with a twenty-five percent or greater minority school enrollment of the option to select their boards by methods other than elections at-large. I will consider each of these arguments in turn.

## C. Severability

I agree that two of the three plaintiffs had standing to argue on the ground of non-severability that the entire statute must fall. Because they had standing as residents of ward 5 to attack the subsidiary voting status of that ward pursuant to subsection B, they also had standing to argue that subsection B could not be severed from the rest of the statute. I disagree, however, that subsection B could not be severed.

A court that finds a statute unconstitutional in part should invalidate no more of the statute than is necessary. *Alaska Airlines, Inc. v. Brock,* 480 U.S. 678, 684, 107 S.Ct. 1476, 1479–80, 94 L.Ed.2d 661 (1987); *State Comp. Fund v. Symington,* 174 Ariz. 188, 195, 848 P.2d 273, 280 (1993). The court need strike the entirety only "where the constitutional and unconstitutional provisions are so connected and interdependent in subject matter, meaning, and purpose as to ... justify the conclusion that the legislature intended them as a whole and would not have enacted a part only." *Symington,* 174 Ariz. at 195, 848 P.2d at 280 (quoting *Millett v. Frohmiller,* 66 Ariz. 339, 343, 188 P.2d 457, 460 (1948)).

Subsections A and B are not so intertwined. They are separate in subject matter, meaning, and purpose. And though subsection B is dependent on subsection A (a district that could not switch from at-large to ward representation would have no need to implement a transition), subsection A is not at all dependent on subsection B. Subsection A does not mandate—it permits—certain districts to switch from at-large to other forms of representation; the ward system is only one of the alternative forms that it permits. Subsection B merely provides a transitional method for those districts that choose the alternative of election by ward.

The lead opinion reasons that striking subsection B from the statute would make the remainder unworkable, as the statute would specify no transitional methodology for districts that switch to election by ward. But the statute already provides no transitional methodology for districts that implement alternative forms of election other than by

---

**16.** In its initial ruling, seeking the most practical and least disruptive means to relieve that injury, the trial court ordered the District to accelerate by one year the election for the board members from wards 4 and 5.

ward; instead, subsection C leaves the implementation of other alternatives entirely up to the districts in consultation with the United States Justice Department.[17] Subsection C thus demonstrates that no particular transitional methodology was integral to the enactment of subsection A. Had the legislature been advised when it enacted § 15–431 that the Constitution barred the transitional method prescribed in subsection B, it would undoubtedly either have prescribed some workable alternative or left the selection, as in subsection C, to the districts in consultation with the Justice Department. *See State v. Watson*, 120 Ariz. 441, 445, 586 P.2d 1253, 1257 (1978); *accord State v. Prentiss*, 163 Ariz. 81, 86, 786 P.2d 932, 937 (1989) (courts may presume that the legislature, if aware of the unconstitutionality of one part of a statute, would have enacted the remainder without the offending portion); *Norton v. Superior Court*, 171 Ariz. 155, 158, 829 P.2d 345, 348 (App.1992).

The question remains whether a shift to ward representation could have been accomplished pursuant to subsection A by a race-neutral, transitional alternative to subsection B. The best answer to this question was provided by Plaintiffs themselves. It was they who outlined various "workable alternatives" to the trial court whereby the legislature could have "effect[ed] a transition from an at-large system to a ward system." It was they who urged that, by substituting such an alternative, "[e]very legitimate interest of the state could have been served without any use of racial classifications." These were excellent arguments for severability. Plaintiffs' present arguments to the contrary are an exercise in blowing hot and cold.

### D. Standing to Attack Subsection A

Because subsections A and B are severable, and because Plaintiffs in their complaint and early memoranda alleged an injury only

pursuant to subsection B, Plaintiffs were obliged, when they moved for reconsideration, to demonstrate their standing to extend an independent attack to subsection A. Specifically, overlooking questions of timeliness, they were obliged to assert a relevant "injury in fact." But Plaintiffs made no effort to do so. They continued to assert no other injury than the lower voting priority that two of them had been assigned as residents of ward 5.[18]

Plaintiffs' failure to supplement or expand their claim of injury is understandable. The two who resided in a disfavored ward had been able to assert an injury under subsection B. But to assert an injury under subsection A, they would have faced the awkward burden of explaining how the legislature could have injured them by extending their district the *option* to switch from at-large voting to voting by ward. The notion that such an option constitutes an injury is a tough sell. Under *Hays*, a plaintiff's claim of injury must not only be "concrete and particularized"; it must be "actual or imminent, not conjectural or hypothetical." 515 U.S. at 743, 115 S.Ct. at 2435. One would search far for a better example than the option-as-injury theory of a claim too abstract and conjectural to pass this test.

In their brief to this court, in lieu of asserting a relevant "injury in fact," Plaintiffs defend their standing to challenge subsection A on a single ground: that as "residents and electors of the District ... [who] pay to support the District and are affected by [its] decisions ... [t]hey have an interest in whether [the] governing board is legally constituted." Plaintiffs cite no authority to support the argument that so abstract an interest confers standing. It does not. It is insufficient to establish standing to assert "a generalized grievance against allegedly illegal governmental conduct." *Id.* One must

---

17. Subsection 15–431(C) provides: "If the governing board has voted to implement any other alternative election system for the election of governing board members, as provided in subsection A of this section, the implementation of the system shall be as approved by the United States justice department."

18. Indeed, after filing their motion for reconsideration, Plaintiffs filed an amended complaint in order to bring the State into the proceedings as a defendant. In the amended complaint, as in the original, the single injury alleged was this: "Residents of the new wards 4 and 5 were not given the opportunity to elect members of the school board, and will not have such an opportunity until 1998."

assert an "injury in fact" with a "causal connection ... [to] the conduct complained of." *Id.* Plaintiffs have not done so.

The lead opinion, advancing an argument that Plaintiffs did not advance themselves, argues that Plaintiffs have standing because, "Where a plaintiff resides in a racially gerrymandered district, ... the plaintiff has been denied equal treatment because of the legislature's reliance on racial criteria, and therefore has standing to challenge the legislature's action." *Id.* at 745, 115 S.Ct. at 2436, *quoted in Bush v. Vera*, 517 U.S. 952, ——, 116 S.Ct. 1941, 1951, 135 L.Ed.2d 248 (1996). There are two problems with this argument. First, Plaintiffs have never asserted that they live in a gerrymandered district.[19] The trial judge stated when he announced his ruling, "This is not a gerrymandering case.... And I have no view on the line-drawing that took place to separate [the wards]. That's not before me." None of the parties demurred.

Second, standing is accorded in gerrymandering cases to any resident of a racially gerrymandered district because such a resident has experienced a "dilution of voting power," which is recognized as a concrete and particularized "injury in fact." *Shaw*, 509 U.S. at 640–41, 113 S.Ct. at 2823 (emphasis omitted). Two of the plaintiffs claimed to have suffered a dilution or abridgment of voting power as residents of ward 5 through the transitional machinery of subsection B, and I do not dispute their standing to attack that part of the statute. But they have never asserted a dilution of voting power through the enabling provisions of subsection A.

The lead opinion finds nevertheless that Plaintiffs suffered an injury pursuant to subsection A because, when the District switched from an at-large to a ward system of voting, "Plaintiffs [could] no longer vote for all five board members; they [could] only vote for one." This finding is extraordinary for two reasons. First, Plaintiffs never asserted such an injury—not in their complaint, not in their motion for summary judgment, not in their motion for reconsideration, and not in their briefing to this court.[20] Second, Plaintiffs throughout their pleadings have asserted just the opposite. They have never complained in this lawsuit of losing the chance to vote for five members at-large; they have complained exclusively that, during the two-year transitional period from 1996 to 1998, while residents of favored wards 1, 2, and 3 get the benefit of ward representation, residents of disfavored wards 4 and 5 must settle for more diluted representation by the two remaining members at-large.[21]

### E. Ignoring Standing

A court may not secure its own standing to engage in constitutional adjudication by cobbling together the arguments that it wishes a plaintiff had made. The "irreducible constitutional minimum" of standing obliges the court instead to closely examine the arguments that a plaintiff did make. The purpose of insisting upon standing is to reserve

---

**19.** A racial gerrymander is "the deliberate and arbitrary distortion of district boundaries ... for [racial] purposes." *Shaw v. Reno*, 509 U.S. 630, 640, 113 S.Ct. 2816, 2823, 125 L.Ed.2d 511 (1993) (quoting *Davis v. Bandemer*, 478 U.S. 109, 164, 106 S.Ct. 2797, 2826, 92 L.Ed.2d 85 (1986) (Powell, J., concurring in part and dissenting in part)). Plaintiffs have neither objected to the boundaries of their district nor persisted in objecting to the boundaries of its wards.

**20.** The lead opinion suggests that such an argument may be found within the complaint's allegations of vote dilution and race-based determination of "who will vote and when." Plaintiffs' trial pleadings, indeed, contain many such allegations. Each, however, refers pointedly and exclusively to Plaintiffs' complaint that the voters of wards 4 and 5 were forced on racial grounds to wait two years to vote.

**21.** Plaintiffs most explicitly set forth this theory in the opening memorandum that accompanied their complaint. There they state:

Who gets to vote first in a system implemented pursuant to A.R.S. § 15–431 depends entirely upon the percentage of "minority" population, i.e., on race. The statute calls for priority and preference in voting to be given on the basis of race and purely on the basis of race.

The plain effect of such a system is to dilute the vote of the racial group which is assigned a lower priority. Until subsequent elections are held, the votes of the disfavored racial groups are represented only to the extent that the two remaining at-large members were elected by the entire district. Meanwhile, the favored racial groups have both their share of the at-large representation and representatives who were specifically elected to represent[ ] their distinct wards.

constitutional litigation for real cases, not abstractions, confine judicial review to issues that the court *must* decide, and narrow the court's remedial focus to the concrete injury at hand. In these ways, the standing requirement serves as a check on judicial overreaching and preserves the integrity of judicial review.

The critical element in standing is the plaintiff's definition of an "injury in fact." In that, the plaintiff not only invokes the remedial power of the court, but confines the remedial energy of the court. In this case, my colleagues' energy exceeds their proper grasp. My colleagues ignore that Plaintiffs have never alleged an injury pursuant to subsection A. They also forgive Plaintiffs for never advising the trial court or Defendants until the motion for reconsideration that they were attacking subsection A. Yet, they fault Defendants for failing to introduce documentation or call witnesses to demonstrate that subsection A was enacted in response to a compelling need. This is fundamentally unfair. *Defendants were obliged to defend what Plaintiffs attacked.* When Plaintiffs addressed their motion for summary judgment, like their complaint and opening memorandum, entirely to the invalidity of subsection B, Defendants had neither reason nor occasion to advance evidence in support of the remainder of the statute. The exchange of motions for summary judgment was the time for evidence to be introduced. When, in their motion for reconsideration, Plaintiffs urged the court, if it found subsection B severable, to adjudicate the constitutionality of the remainder of the statute, they did so on the basis of the evidence that the parties had already brought forward in their motions for summary judgment. My colleagues fault Defendants for a failure to come forward *with evidence they were never called upon to* supply.

## III. SUMMARY

Because I believe that laches bars this suit, I agree with Judge Kleinschmidt's conclusion that the trial court abused its discretion in setting aside the 1996 election. (My view of standing and severability supports this conclusion as well.) I respectfully dissent from the conclusion that the District must hold at-large elections in 1997. This suit should be dismissed altogether on the ground of laches. Alternatively, if any part of the suit were entertained, that part should be the only part for which Plaintiffs asserted an "injury in fact"—the abridgment of suffrage experienced by the voters of wards 4 and 5. For that injury, as the trial court originally concluded, a far less drastic remedy would suffice.